## JOHN WANAMAKER PHILADELPHIA v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8439.

Circuit Court of Appeals, Third Circuit.
Argued Nov. 16, 1943.
Decided Dec. 30, 1943.

Joseph A. Lamorelle, Philadelphia, Pa. (Maurice Bower Saul, and Saul, Ewing, Remick & Harrison, all of Philadelphia, Pa., on the brief), for petitioner.

Bernard Chertcoff, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before BIGGS, MARIS, and JONES, Circuit Judges.

MARIS, Circuit Judge.

This is a petition to review a decision of the Tax Court. The facts were stipulated and the stipulated facts were adopted by the Tax Court as its findings of fact. 1943, 1 T. C. 937.

John Wanamaker Philadelphia, the taxpayer, is a Pennsylvania corporation which owns and operates a department store in Philadelphia. Prior to December 14, 1920, its outstanding capital stock consisted of 75,000 shares of common stock of the par value of $7,500,000. Of these shares 73,-995 were held by John Wanamaker, 1,000 by his son, Rodman Wanamaker, and 5 by his associate, William L. Nevin. The same three men also comprised the taxpayer's board of directors. On the date mentioned the taxpayer was indebted to John Wanamaker in an amount in excess of $1,000,000 upon an open account.

On December 14, 1920, the taxpayer's board of directors passed a resolution increasing the taxpayer's authorized capital stock from $7,500,000 to $8,500,000, the increase of $1,000,000 to be represented by 10,000 shares of preferred stock. The taxpayer's stockholders approved the increase. On the same day the stockholders accepted an offer of John Wanamaker to take in

payment of $1,000,000 due him by the taxpayer 10,000 shares of preferred stock of the par value of $1,000,000 and authorized the issuance of a certificate for that number of shares of preferred capital stock to his nominee, Fidelity Trust Company (now Fidelity-Philadelphia Trust Company), as trustee. On December 15, 1920, John Wanamaker delivered the certificate to Fidelity Trust Company as trustee, together with a letter of instructions as to the terms of the trust. On the same day John Wanamaker made a gift of his 73,995 shares of common stock to Rodman Wanamaker. John Wanamaker died December 12, 1922.

The resolutions of the board of directors and stockholders increasing the taxpayer's capital stock and the certificate for the 10,000 shares of preferred stock issued to Fidelity Trust Company as trustee each contained the following provisions:

"(a) Said Preferred Capital Stock shall receive annual dividends of six (6) per cent and not more to be declared by the Board of Directors, at the times and under the conditions referred to under Section (d), but shall participate in no dividends in excess of six (6) per cent per annum. Said preferred capital stock shall not particiapte in the good-will of the business of John Wanamaker Philadelphia.

"(b) Said preferred capital stock shall have no voting power, nor shall the recipient of the interest to be derived therefrom have any interest direct, or indirect, in the business of John Wanamaker Philadelphia, or any Corporations connected therewith, beyond the enjoyment of the amount of dividends declared on said preferred capital stock by the directors of John Wanamaker Philadelphia.

"(c) The holders of said preferred capital stock shall have no right of an accounting, inspection, or other privilege against the said corporation, or any corporations connected therewith, at any time or any direction, control, or suggestion, in the management of the business of said corporation, or of any corporations connected therewith.

"(d) After six months from demise of John Wanamaker the within stock shall begin to bear interest, and, after one year from date thereof, the first dividend shall be declared thereon. On one year's written notice, after date of the first dividend, the Corporation shall purchase at one hun-

dred and ten ($110) Dollars a share, all, or such part of said preferred capital stock, not less than Fifty Thousand ($50,000) Dollars per annum, as it shall elect at the end of each fiscal year of the business of John Wanamaker Philadelphia, under said terms and conditions, until the entire issue of ten thousand (10,000) shares shall have been bought, at which time said preferred capital stock shall be delivered to John Wanamaker Philadelphia.

"(e) Upon dissolution, voluntary liquidation, or sale of all the property, and assets of John Wanamaker Philadelphia the payment of the preferred capital stock shall be deferred to the payment of the common capital stock; after the common capital stock has been paid, in full, at par, the preferred capital stock shall be paid, in full, at par; after both the common capital stock and the preferred capital stock shall have been paid in full at par, any remaining assets, either in cash, or in property, shall be distributed pro rata among the holders of the common capital stock according to their respective holdings."

After the death of John Wanamaker and in accordance with paragraph (d) of the preferred stock certificate, the preferred stock began to bear dividends at the rate of 6% per annum commencing June 12, 1923. The first dividend was paid December 12, 1923, and the taxpayer made payments semiannually thereafter until December 12, 1932. No dividends were declared or paid during the period from December 12, 1932, to December 12, 1935. Litigation in the Pennsylvania courts as to the right of the owners of the preferred stock to dividend payments for this period resulted in a judgment against the taxpayer which was affirmed in Warburton v. John Wanamaker Philadelphia, 1938, 329 Pa. 5, 196 A. 506.

The taxpayer accrued on its books preferred stock dividends in the amount of $49,500 for its fiscal year 1937. The amount thus accrued was paid during that fiscal year. For the fiscal year 1938 it accrued on its books preferred stock dividends of $45,000 for the current year and $164,677.06 for the three back years ended December 12, 1935. The current accrual of $45,000 was paid in that fiscal year and the back accrual of $164,677.06 shortly thereafter. The taxpayer deducted from gross income in its income tax returns for 1938 as interest accrued on in-

debtedness the total amount, $209,677.06, accrued in that year. The Commissioner disallowed this deduction as well as the similar deduction of $49,500 claimed by the taxpayer for 1937.

In the capital stock tax returns filed by the taxpayer for the fiscal years 1933 to 1937, inclusive, the preferred stock was listed as capital stock and the par value of the outstanding shares was included as part of the declared value for capital stock tax purposes. In each of those years the taxpayer redeemed 500 shares of the preferred stock by payment of $55,000 in cash as required by paragraph (d) of the stock certificate. In the capital stock tax returns for the fiscal years 1935 and 1937 the amounts paid in redemption of the shares retired were shown as liquidating distributions. During the taxable years ended January 31, 1936, January 31, 1937 and January 31, 1938 the taxpayer kept its books and filed its income tax returns on the accrual basis.

■ The first question presented by the petition for review is whether the preferred stock dividends accrued by the taxpayer on its books in the taxable years are deductible as interest accrued on indebtedness under Section 23 (b) of the Revenue Acts of 1934 and 1936, 26 U.S. C.A. Int.Rev.Code, § 23(b). That section provides:

"§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

$$* \qquad * \qquad * \qquad * \qquad *$$

"(b) Interest. All interest paid or accrued within the taxable year on indebtedness * * *."

Since the claim is for a tax deduction, a matter of legislative grace, the taxpayer must not only point out the statute under which the deduction may be claimed but must also prove that he comes within its terms. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; Pacific Southwest R. Co. v. Commissioner of Internal Rev., 9 Cir., 1942, 128 F.2d 815, certiorari denied 317 U.S. 663, 63 S.Ct. 64; First Mortgage Corp. v. Commissioner of Int.Rev., 3 Cir., 1943, 135 F.2d 121. The Tax Court cannot be held to have erred in sustaining the Commissioner's disallowance of the claimed deductions unless the taxpayer has met the burden of proving that the dividends accrued upon the preferred stock were in reality interest upon indebtedness. Whether we consider the nomenclature used by the parties, the circumstances surrounding the issue of the preferred stock, the substantive rights created by the preferred stock or all these factors combined we think the taxpayer has fallen short of meeting this burden.

■ It is clear that the nomenclature used by the parties is not conclusive; that what is called capital stock may be in actual fact indebtedness and what is termed a dividend may be in reality interest. Commissioner of Internal Revenue v. Proctor Shop, 9 Cir., 1936, 82 F.2d 792; United States v. Title Guarantee & Trust Co., 6 Cir., 1943, 133 F.2d 990. Nomenclature is, however, a factor which is not to be ignored. 1 Mertens, Law of Federal Income Taxation, § 9.24. In the resolutions of the board of directors and stockholders increasing the taxpayer's authorized capital stock, in the resolution of the stockholders accepting the offer of John Wanamaker to cancel $1,000,000 of the taxpayer's debt in exchange for the preferred stock, in the certificate issued by the taxpayer to the trustee designated by John Wanamaker and in the letter of John Wanamaker transmitting the certificate to the trustee together with instructions for the operation of the trust, the preferred stock was designated "preferred capital stock". The fact that the individuals involved were astute and experienced business men makes it reasonable to conclude that the phrase "preferred capital stock" was used with full understanding of its purport. It is significant that the payments to be made upon the preferred stock are designated in paragraph (a) of the resolutions and certificate to which we have referred as dividends to be declared by the board of directors. The only inconsistency in nomenclature appears in paragraphs (b) and (d) where the payments are sometimes referred to as interest and at other times as dividends. On the whole, if nomenclature were the sole aid in determining the relationship created by the preferred stock, the conclusion that it was one of creditor-debtor would find scant support.

The circumstances under which the preferred stock was issued likewise fail to support the contention that a creditor-debtor relationship was intended. Indeed all the formal steps taken by the taxpayer preceding the issuance of the preferred

stock were those which the law stipulated as prerequisite to the issuance of new stock. Had a creditor-debtor relationship been intended it would have been necessary merely for the board of directors to have authorized the execution of bonds or notes or some other evidence of an already existing indebtedness, subject to the same conditions as were placed in the preferred stock certificate. It would have been wholly unnecessary to authorize an increase of the capital stock or indebtedness, or to obtain the approval of the stockholders to such an increase, for there would have been no increase of either involved in the transaction. These proceedings were, therefore, wholly meaningless unless they were intended to effectuate the creation of additional capital stock. The dividends which were paid on the preferred stock after John Wanamaker's death were declared semiannually by the board of directors. Had these payments been payments of interest rather than dividends there would have been no need for such a declaration by the board of directors. Moreover the preferred stock was included as capital stock in the taxpayer's capital stock returns. In the returns for 1935 and 1937 the amounts paid for the redemption of shares were shown as liquidating distributions. Quite obviously the parties thought they had created stock and acted accordingly.

■ If we examine the preferred stock certificate to determine what substantive rights are secured thereby to the owners we find that several important characteristics of a creditor-debtor relationship are absent. In First Mortgage Corp. v. Commissioner, 3 Cir., 1943, 135 F.2d 121, we pointed out several of those characteristics: a fixed or determinable maturity date at which time the holders may legally enforce payment of the principal and accumulated dividends if the corporation is in default; a fixed rate of interest payable even in the absence of profits; the right in the event of dissolution or liquidation to share in the assets before stockholders. It is quite doubtful whether the first two characteristics are present. It is beyond doubt that the most significant characteristic of a creditor-debtor relationship—the right to share with general creditors in the assets in the event of dissolution or liquidation—is absent. Subparagraph (e) not only does not provide that the holders of the preferred stock shall share on a par with general creditors but on the contrary stipulates that they shall be deferred until after the common stock has been paid in full. The reasonable conclusion to be drawn from the fact that the holder of preferred stock is subordinated to creditors is that he is a stockholder rather than a creditor. Commissioner of Internal Revenue v. Meridian & Thirteenth R. Co., 7 Cir., 1942, 132 F.2d 182. When all the factors are considered we are compelled to conclude that the taxpayer has failed to establish that a creditor-debtor relationship existed. Since the preferred stock did not represent an indebtedness it follows that the amounts of dividends accrued in the taxable years by the taxpayer are not deductible under Section 23(b) of the Revenue Acts of 1934 and 1936 as interest accrued on indebtedness.

In the litigation to which we have referred the Pennsylvania courts did not hold, as the taxpayer now contends, that the payments made by it on its preferred stock represented payments of interest on indebtedness. All that was there decided was that the taxpayer could not, by failing to declare a dividend, deprive the owners of the preferred stock of the annual 6% return stipulated for by the certificate. The ruling of the Supreme Court of Pennsylvania in that case was that the dividends were cumulative. It reached this conclusion because it found that to be the intent of the taxpayer and of its principal stockholder, John Wanamaker, when the stock was issued. Warburton v. John Wanamaker Philadelphia, 1938, 329 Pa. 5, 196 A. 506.

■ As we have seen, the taxpayer, complying with the direction in paragraph (d) of the preferred stock certificate, in each of the years 1933 to 1937 inclusive, redeemed 500 shares of the preferred stock by the payment of $55,000 in cash. It deducted from gross income in its returns for each of those years the redemption premium of $5,000. These deductions were disallowed by the Commissioner and his action was sustained by the Tax Court. The second question presented by the petition is whether these premiums were properly deductible in determining net taxable income. In view of our conclusion that the preferred stock did not represent indebtedness it follows that the premiums paid by the taxpayer in each of the fiscal years 1936, 1937 and 1938 in connection with the redemption of its preferred stock

were liquidating distributions upon stock and may not be deducted from gross income for those years as items of expense. Pacific Southwest R. Co. v. Commissioner of Internal Rev., 9 Cir., 1942, 128 F.2d 815, certiorari denied 317 U.S. 663, 63 S. Ct. 64.

The third question raised by the taxpayer's petition is whether the Tax Court erred in upholding the Commissioner's disallowance of its claim for a bad debt deduction in respect of certain first mortgage bonds of Shelbourne, Incorporated, in the fiscal year ended January 31, 1938. In 1925 the taxpayer acquired these bonds at their face value of $375,000. The bonds were secured by a first mortgage upon the Shelbourne Hotel in Atlantic City, which was substantially the corporation's only asset. The first mortgage bonds outstanding amounted to $2,629,500. In addition the corporation had outstanding $550,000 of second mortgage bonds and notes and accounts payable of over $500,000. On July 13, 1931, upon default in interest payments, proceedings were instituted by the bondholders, including the taxpayer, in the Court of Chancery of New Jersey to foreclose the mortgage. A decree foreclosing the mortgagor's equity of redemption was entered by that court on June 29, 1933. No foreclosure sale took place, however, but the hotel was operated from July, 1931, to March 11, 1939, by custodial receivers appointed by the Court of Chancery.

On May 9, 1936, Shelbourne, Incorporated, at the instigation of the bondholders, filed a voluntary petition to reorganize pursuant to the provisions of Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. A plan of reorganization was filed in November 1937, was submitted to the bondholders for approval on December 20, 1937, and was accepted in writing by the taxpayer on January 4, 1938. By March 25, 1938, written acceptances by holders of more than two-thirds of the outstanding first mortgage bonds had been filed. In July, 1938, the plan was amended and on August 19, 1938, the plan as amended was approved and confirmed by the court. In December, 1938, Shelbourne Hotel Corporation was organized and the assets of Shelbourne, Incorporated, were transferred to it. Pursuant to the reorganization plan as amended the taxpayer shortly after October 27, 1939, received $187,500 par value of general mortgage bonds of the Shelbourne Hotel Corporation and 3,750 shares of common stock in exchange for the first mortgage bonds of Shelbourne, Incorporated, which had been owned by it. Immediately after the exchange the first mortgage bondholders of Shelbourne, Incorporated, owned all the stock of Shelbourne Hotel Corporation and received the stock and bonds of the new corporation substantially in proportion to their interests in the property prior to the exchanges. Under the reorganization plan the holders of second mortgage bonds and the general creditors received only rights to subscribe to the common stock of the new corporation at $30 per share and the stockholders of the old corporation were wholly eliminated.

In its income tax return for the taxable year ended January 31, 1938, the taxpayer computed its bad debt deductions on the reserve method. In that return it deducted $299,818.07 as an addition to its reserve for bad debts. Included in this sum was $187,500 representing one-half of its investment in the Shelbourne bonds which it claimed to be worthless. The item of $187,500 was disallowed by the Commissioner and his action was sustained by the Tax Court. The deduction was claimed under Section 23(k) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 23(k), which provides:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

\*  \*  \*  \*  \*

"(k) Bad debts. \* \* \* Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

Any deduction under this section must, obviously, be made in respect of a debt owing to the taxpayer. Under the facts we conclude that this first requisite is absent here. As we have seen, the bondholders foreclosed the mortgage covering substantially all the property of Shelbourne, Incorporated. When the decree foreclosing that corporation's equity of redemption was entered in 1933 the corporation lost its equity in the property and the bondholders became the equitable

owners of the corporation's property. We think that at that time what had previously been a debt evidenced by bonds secured by a mortgage on property was converted into a proprietary interest in the mortgaged property. Moreover it is even clearer that in 1936 when the petition for reorganization under Section 77B was filed the first mortgage bondholders had become the equitable owners of the mortgaged property and that the old corporation had lost all equity therein. For that corporation was then hopelessly insolvent, having lost substantially all its property by foreclosure three years before, and as a result not only were its stockholders excluded entirely from participation in the reorganization but even its second mortgage and general creditors were also excluded, being given merely the right to buy stock in the new company. Under these circumstances the Supreme Court has held that equitable ownership in the property of the debtor company passes to the creditors entitled to participate therein at "the time when the processes of the law were invoked 'to enforce their rights of full priority'." Helvering v. Cement Investors, 1942, 316 U.S. 527, 532, 62 S.Ct. 1125, 1127, 86 L.Ed. 1649. From that time the creditors become proprietary owners. When later they receive the securities of the new corporation in ostensible exchange for their bonds they are in reality giving up their equitable interest in the property even though the actual conveyance to the new corporation is made by a trustee or by the old corporation as holder of the legal title.

In the taxable year 1938, therefore, the bondholders, including this taxpayer, while still in form creditors of Shelbourne, Incorporated, were as a result of the foreclosure decree and the reorganization proceeding, in reality equitable owners of the Hotel Shelbourne. By that time Shelbourne, Incorporated, and its stockholders had ceased to have any equitable interest in the property even though the legal title may still have remained in the corporation to be disposed of as the reorganization court might direct. It follows that in 1938 the taxpayer could not charge off as a debt worthless in part what was no longer a debt, but an equitable interest in the property which formerly secured it. Even though we should concede that the taxpayer sustained a loss from the transaction it was a loss resulting from the ex-change of its equitable interest in the property for the bonds and stock of the new corporation rather than a loss resulting from the partial worthlessness of a debt. Levy v. Commissioner of Internal Revenue, 2 Cir., 1942, 131 F.2d 544, certiorari denied 318 U.S. 780, 63 S.Ct. 858. We conclude that the Tax Court was right in sustaining the Commissioner's disallowance of the bad debt deduction claimed by the taxpayer in respect of the Shelbourne bonds. In the view we take it becomes unnecessary to discuss the other grounds advanced by the Commissioner to sustain his disallowance.

The decision of the Tax Court is affirmed.