**DIAMOND BROS. COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 14280.

United States Court of Appeals
Third Circuit.

Argued June 6, 1963.

Decided Sept. 24, 1963.

Alan I. Baskin, Reading, Pa., for petitioner.

Morton K. Rothschild, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before BIGGS, Chief Judge, and McLAUGHLIN and GANEY, Circuit Judges.

GANEY, Circuit Judge.

The question posed on this petition for review is whether advances by petitioner to Park Lane Furniture Mfg., Inc., (a corporation in which petitioner was a 50% stockholder) from October of 1953 through December of 1954 were loans or capital contributions. The Tax Court [1] found that the advances were contributions to capital, and sustained the Commissioner of Internal Revenue's determination of income tax deficiency, based on his disallowance of petitioner's claim in its income tax return that $100,079.75 of the advances was a bad-debt deduction in its fiscal year ending June 30, 1955, under § 166(a) (1) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 166(a) (1). [2]

The petitioner, Diamond Brothers. Company, is a corporation organized under the laws of New Jersey, with its principal place of business in Reading, Pennsylvania. During the fiscal year ending June 30, 1955, its principal place of business was in Trenton, New Jersey, and its income tax return for that fiscal year was filed with the district director of internal revenue, Camden, New Jersey. The petitioner's business is the manufacture and sale of upholstered living-room furniture. Sol Diamond, a director and vice president of petitioner, owned one-third of its stock.

A rather detailed recital of the factual background is here requisite for the proper disposition of the problem posed.

Park Lane Furniture Mfg., Inc., was a California corporation with plants in Santa Monica and Gardena of that State. [3] Sigmund Berkowitz owned 125 shares or

---

1. The findings and opinion of the Tax Court may be found in 21 TCM 696 (1962).

2. This section, entitled "Bad Debts", provides:

   "(a) *General rule.*—

   "(1) *Wholly worthless debts.*—There shall be allowed as a deduction any debt which becomes worthless within the taxable year."

3. It leased the plant in Santa Monica and owned the one in Gardena. The latter plant was carried on Park Lane's record as having a value of $82,150.00, subject to trust deeds in the amount of at least $43,370.65.

one-half of the issued and outstanding common stock of Park Lane; Harry and Stanley Strasberg, together, owned the other half. Sigmund was chairman of the board of the corporation; the Strasbergs were directors. During the fiscal year ending June 30, 1952, Park Lane had a deficit of $30,071.12 and needed working capital. Sigmund wanted to obtain additional capital for the corporation, but was unable to do so. His credit rating was not high at the time and Park Lane's credit had been extended to almost the limit and it could not obtain a bank loan without the guarantee of the Strasbergs. The latter, who were already guarantors for the repayment of a Park Lane bank loan as well as being contingently liable on certain of its accounts payable by reason of written guarantees or oral assurances, were apparently unwilling to personally guarantee any more borrowing by Park Lane or Sigmund.

At a furniture convention held sometime before August 3, 1953, Sigmund approached Sol Diamond and told him that he (Sigmund) and his associates had agreed to separate. He asked Sol if, in return for a half interest in Park Lane, petitioner would be willing to expand its business to the west coast and assist in increasing the business of Park Lane by using its facilities as an outlet for its products. He told Sol that Park Lane needed working capital and asked him if petitioner had a banking connection. Sol was interested and went to a bank in Camden, New Jersey, and worked out an agreement whereby the bank would lend money to Park Lane. Some of the conditions were that petitioner would "stand in back" of Park Lane, that Park Lane's accounts receivable would be given as security and that Park Lane's books be kept in Trenton for inspection and audit by the bank. Petitioner consented to this agreement and the bank made loans to Park Lane.

On or about July 27, 1953, Quaker Pile Fabric Corp. obtained a judgment against Park Lane for $9,716.27 with interest at 7% plus costs. Prior to the entry of the judgment, Quaker Pile Fabric Corp. caused a writ of attachment to issue against the assets of Park Lane. In order to have the attachment released, Park Lane obtained a bond for which it deposited $2,500, and Harry Strasberg deposited with the bonding company a certificate of indebtedness in the sum of $10,000.

In California, on August 13, 1953, the petitioner joined in a written agreement with Sigmund, his wife, Norma, and the Strasbergs and Park Lane, whereby Sigmund obtained the remaining half interest in Park Lane from the Strasbergs in return for his wife's interest in Imperial Mills, Inc. The Strasbergs were to resign as officers and directors of Park Lane, while Sigmund and his wife were to give up their positions as officers and directors of Imperial Mills. Park Lane was to deliver two promissory notes to Harry Strasberg, one in the amount of $5,000, payable after sixty days, the other in the amount of $9,500, payable after thirty days; to pay him $193.05 representing accrued interest on the certificate of indebtedness in return for the certificate; and to pay the balance of costs, not exceeding $500, in Quaker Pile's suit against it. The Strasbergs also agreed to release Park Lane of any other claims which they might have against it.

In the same agreement, petitioner agreed inter alia, as follows: To obtain, along with Sigmund, the release within six days of the Strasbergs as guarantors on the balance of a Park Lane bank loan (then approximately $67,094.56), for which some of Park Lane's accounts receivable had been assigned to the bank as security;[4] to guarantee the payment within ten days of certain accounts payable by Park Lane in the approximate amount of $20,000 for which the Stras-

---

**4.** As between petitioner and Sigmund, in the concurrent agreement among petitioner, Sigmund and Park Lane, peti-

tioner agreed that this obligation was to be its reponsibility and not that of Sigmund's.

bergs were contingently liable; to guarantee the payment, along with Sigmund, of Park Lane's promissory note of $9,500, payable to Harry Strasberg; to guarantee the payment of Park Lane's promissory note of $5,000 payable to Harry Strasberg; to guarantee Sigmund's promise to indemnify Imperial Mills from half of any losses (not to exceed $5,000) which might be incurred in the collection of approximately $20,000 worth of its accounts receivable; and to lend Sigmund $2,500.

Concurrently with the above agreement, petitioner, Sigmund and Park Lane also entered into a written agreement which recites that as consideration for petitioner's entering into the other or main agreement, Sigmund "sells, assigns, and conveys and transfers" 50% of the shares of stock in Park Lane to it without any further consideration from petitioner to Sigmund. The agreement also set forth the following conditions: As long as petitioner and Sigmund held the stock in Park Lane, they were to elect Sigmund as president and a director, and Sol Diamond, or some other person designated by petitioner, as vice president and a director of Park Lane. Sigmund was to act as general manager of Park Lane and receive a salary of $150 a week plus expenses; and he was not to engage in another business similar to or competitive with that of Park Lane or invest in any business that would require his personal attention. Except for the payment of wages and expenditures from petty cash accounts, no withdrawals from Park Lane's banking accounts were to be made without the signature of either Sol Diamond, as vice president of Park Lane, or of another person designated by petitioner. However, all purchase invoices were to be approved by Sigmund before they were paid. Payroll and petty cash records, copies of which were to be sent petitioner at its office, were to be kept at the business office of Park Lane in California; all other books and records of Park Lane were to be kept at petitioner's office in Trenton, New Jersey. Sidney Gushen was to act as a director and secretary-treasurer of Park Lane with the right of either petitioner or Sigmund to request his resignation. Neither petitioner nor Sigmund were to sell any of their shares of stock without first making a written offer to the other of the shares to be sold. If obtainable, Sigmund was to apply for a life insurance policy not to exceed $50,000, Park Lane was to be irrevocably named as beneficiary and the latter was to pay the premiums.[5]

As a guide to the parties to the agreement concerning the financial condition of Park Lane as of June 30, 1953, a "proforma" balance sheet was prepared, based on an audit of its books and records. The sheet reflected the following figures: A net profit of $32,099.36 for the fiscal year; current assets of $13,486.92; current liabilities of $241,133.90 and capital of $64,925.97. The latter amount consisted of the total of $25,000.00, the fixed value of the issued and outstanding stock held by petitioner and Sigmund, $37,936.-49, the amount of notes payable to the officers and stockholders of Park Lane prior to June 30, 1953, and $1,989.48, the difference between $32,099.36, the net profit for the fiscal year, and $30,109.88, the deficit for the previous period. The sheet also showed that approximately half of its accounts receivable were assigned as security for loans; that among its current liabilities there was a bank overdraft of $4,272.85, accounts payable amounting to $113,166.06, and a bank loan of $67,094.56.

---

5. Some of the other provisions were as follows: In the event of Sigmund's death while a stockholder, Park Lane was to purchase his shares, at the value last fixed by the board of directors, from his personal representative, and the entire proceeds from the insurance policy were to be used toward the purchase of those shares. In the event Park Lane was unable to pay Sigmund's estate the purchase price, less the amount of any insurance collected on Sigmund's life within six months after his death, then petitioner was to pay it thereafter within three months. In addition, Park Lane was to pay Sigmund's widow $150 a week for six months beginning with the date of Sigmund's death.

A comparison of the "pro-forma" balance sheet with that of Park Lane's shows that some items in the former were changed so as to reflect a more favorable picture of Park Lane's financial position as to current assets and capital. Two items, $37,936.49, representing notes payable to stockholders, and $82,150.00, the book value of a building and land owned by Park Lane, had been subtracted from current liabilities of $361,220.39, in order to arrive at the figure of $241,133.90 for current liabilities on the "pro-forma" sheet. The $82,150.00 was not listed under fixed assets so as not to reflect a change in the net worth of Park Lane. Since the building and land had not been sold, current liabilities should have been increased by $82,150.00 for a total of $323,283.90, which exceeded current assets by $39,878.40. Moreover, if the $25,000.00 representing the fixed value of the stock and $37,936.49, representing the notes, are disregarded, Park Lane had capital of only $1,989.48 to work with. Petitioner was given copies of the "pro-forma" balance sheet as well as Park Lane's sheet.

The provisions of the agreement were carried out with respect to records and accounts of Park Lane and the head of petitioner's accounting department kept the books of both petitioner and Park Lane.

From time to time after petitioner acquired stock in Park Lane, it guaranteed payment of Park Lane's purchases from various suppliers. Without the guarantees these suppliers would not extend even short term credit to Park Lane. The minutes of the meeting of petitioner's board of directors, at which the authorizations for guaranteeing the purchases were made, recite that it was to the advantage of petitioner to guarantee the purchases. On November 11, 1953, petitioner executed a contract of general unconditional guarantee, not to exceed $300,000, to repay Park Lane's bank loan when it became due if demanded by the bank.

Beginning in October of 1953, petitioner began advancing funds to Park Lane. In that month it advanced $60,000 and in December, $10,000. These advances were listed in petitioner's books under an account entitled "Loans Receivable—Park Lane". No notes or other evidence of indebtedness, except upon its books and records, were ever executed by Park Lane regarding these advances, nor were any repayment dates set by the parties or any interest charged or paid on the advances.

On December 16, 1953, petitioner finally decided to explore the opportunity to raise new capital of approximately a quarter of a million dollars by offering to sell some of its common stock to the public. Its circular, issued January 1, 1954, offering 199,800 shares at par value of $1.50 each, recites in part:

"The third greatest concentration of people is in the Los Angeles-San Francisco area on the West Coast. Hence seeing an opportunity for expansion, the Company [petitioner] acquired a 50% interest in the Park Lane Furniture Company * * * in August 1953. Such 50% interest was acquired by the Company without consideration except for an arrangement * * * pursuant to which the Company and its management supplies technical skill, gives advice and renders assistance to Park Lane in respect to production, sales and finances and permits Park Lane to sell its products under the name of the company, thus benefiting by the Company's national advertising.

   \*     \*     \*     \*     \*     \*

"The acquisition of Park Lane has given Diamond Bros. an interest in the vast West Coast potential. * * Prior to the acquisition by Diamond Bros. of its 50% interest therein, Park Lane has never shipped more than $85,000 of merchandise in any one month. Its shipments in November of this year [1953] exceeded $230,000."

Though Park Lane's balance sheet showed that its current assets were less than its current liabilities as of December 31, 1953, during the first three

months of 1954, petitioner made advances totaling $49,678.36 to Park Lane. In the first two months of the same year, the petitioner credited "Loans Receivable—Park Lane" account with having received or having been paid $386.00.

For the period July 1, 1953, to March 31, 1954, though Park Lane's records showed that it had net sales of $1,611,087.39, a gross profit of $390,394.89, and a net profit on operations of $31,114.91, it incurred other expenses of $59,623.11, with a resulting net loss for the period of $28,508.20. Despite this unfavorable financial picture, petitioner continued to make advances amounting to $70,819.44 to Park Lane in the remaining months, except July, of 1954. In addition to the above advances, the petitioner charged Park Lane with having received $25,000 in August. This was reflected under an account entitled "Park Lane—Misc." In the same months, except September, petitioner credited the "Loans Receivable—Park Lane" account with having received $88,733.05.

On November 9, 1954, the bank called upon petitioner to make good its unconditional guarantee of Park Lane's obligations, and petitioner paid the bank $83,542.24, the balance on a loan made by the bank to Park Lane. In return the bank transferred to petitioner Park Lane's note and accounts receivable of $148,222.25, held by the bank as security.

On November 16, 1954, Park Lane filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in the Central Division of the United States District Court for the Southern District of California. Thereafter, petitioner continued to make advancements, in decreased amounts, to Park Lane through June of 1955. From October of 1953 to June of 1955, the advances totaled $104,079.75. From this amount the petitioner

subtracted $4,000.[6] Petitioner reported the balance of $100,079.75 as a bad debt in its income tax return for the fiscal year ending June 30, 1955. The respondent admits that if the amount is found to be a loan, the entire amount became worthless as a bad debt in 1955.

At the outset petitioner complains, since the respondent offered no testimony on its behalf except by way of agreeing to a stipulation of facts, that the Tax Court's findings are contrary to what it considers the undisputed testimony its witnesses established. Whether advances made by a taxpayer to a corporation in which he is a stockholder are loans or contributions to capital is a question of fact. Gilbert v. Commissioner, 262 F.2d 512, 513 (C.A.2, 1959), cert. den., 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed. 2d 1030. The burden of proving the reality of the loans rests on the taxpayer. White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172 (1938); P. M. Finance Corporation v. Commissioner, 302 F.2d 786, 789 (C.A.3, 1962); Matthiessen v. Commissioner, 194 F.2d 659 (C.A.2, 1954). Merely because the taxpayer presents testimony on his behalf which is not contradicted by witnesses offered by the Commissioner of Internal Revenue does not mean that the taxpayer is entitled to a decision for that reason.[7] It is the duty of the Tax Court, in the first instance, to determine the credibility of the witnesses, to weigh the evidence, draw inferences from undisputed facts or facts found by it to exist, and to choose between conflicting inferences in reaching its ultimate findings. See Wilmington Trust Co. v. Helvering, 316 U.S. 164, 62 S.Ct. 984, 86 L.Ed. 1352 (1942); Boehm v. Commissioner, 326 U.S. 287, 293, 66 S.Ct. 120, 90 L.Ed. 78 (1945); Sheaffer's Estate v. Commissioner, 313 F.2d 738 (C.A.8, 1963); Fearing v. Com-

6. This latter figure represents the sum of the following amounts: $700 from the $2,085.00 advanced in October of 1954, $400.00 from the $1,105.07 in November $300.00 from the $553.41 in December, and the entire amount of the $2,600.00 made over the first half of 1955.

7. See United Airline Company v. Commissioner, 316 F.2d 701, 704 (C.A.1, 1963); Burden of Proof, First and Second Meaning, IX Wigmore on Evidence (3rd Ed.) §§ 2485, 2487, and 2489.

missioner, 315 F.2d 495 (C.A.8, 1963). Also see Carpenter v. Commissioner, 322 F.2d 733, (C.A.3, 1963); Lustman v. Commissioner, 322 F.2d 253, (C.A.3, 1963). The Tax Court need not accept the testimony of witnesses at face value if it finds that the outward appearance of the facts in their totality convey an impression different from the spoken word. Simon v. Commissioner, 285 F.2d 422, 424–25 (C.A.3, 1960); Truck Terminals, Inc., v. Commissioner, 314 F.2d 449 (C.A.9, 1963).

Despite the pronouncement in the written agreement of August 13, 1953, in which the petitioner obtained a half interest in Park Lane, the Tax Court found that the parties to the agreement anticipated and expected that the petitioner would make advances to Park Lane. Petitioner contends that nowhere in the testimony is there a place that a reasonable inference can be drawn showing that the petitioner expected to make the advances which it subsequently made. We disagree.[8] Concededly, it is the circumstances at the time under which the advances were made that are important. Nevertheless, what the parties to a transaction thought or expected prior thereto may have some tendency to prove what the transaction is when it takes place.

Petitioner argues that the Tax Court, in making its findings, did not take into account that the officers and employees of petitioner, without contradiction, used terms of indebtedness in referring to the advances. The nomenclature used is a factor which is not to be ignored. John Wanamaker Philadelphia v. Commissioner, 139 F.2d 644, 646 (C.A.3, 1943). Yet professed intentions and labeling must give way if the Tax Court finds on supporting evidence that in reality the advances were something other than a debt. Such a finding must stand unless it is "clearly erroneous."[9] Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Commissioner v. Goodwyn Crockery Co., 315 F.2d 110, 113 (C.A.6, 1963). Our job is to determine whether the Tax Court's findings meet the test.

A debt is different from a capital investment even though it may, in certain particulars, have the same characteristics as the latter. The Treasury Regulations concerning bad debts defines a bona fide debt as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."[10] All the outward indicia of that relationship may be present and still the

8. Sigmund Berkowitz desired that Park Lane have working capital; he was not too much concerned whether it was supplied by petitioner or it came from loans, the repayment of which was guaranteed by petitioner. Nevertheless, it was a permissible inference that he expected petitioner to make the advancements, for his wife gave up a half interest in Imperial Mills, Inc., so that petitioner could take over the Strasbergs' interest in Park Lane. It was clearly permissible to infer that petitioner had prior expectations of making the advancements. It wanted to expand its business. It chose the centers of two populous areas of the country. It wanted to raise over a quarter of a million dollars by a public offering of a part of its shares of stock. The branching out of its business into the third most populous area of the country, and being able to proclaim that it was responsible for an increase in Park Lane's shipments of merchandise since it acquired a half interest in that corporation would be a good selling point in the offering of its stock to the public.

9. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

10. Section 1.166–1(c) of Treasury Regulations on Income Tax (1954) Code provides:

"(c) *Bona fide debt required.* Only a bona fide debt qualifies for purposes of Section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A contribution to capital shall not be considered a debt for purposes of Section 166. * * *"

advancement be found not to be a bona fide debt.[11] For example, see P. M. Finance Corporation v. Commissioner, supra; O. H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123 (C.A.9, 1960); Brake & Electric Sales Corporation v. Commissioner, 287 F.2d 426 (C.A. 1, 1961); and Charter Wire, Inc., v. United States, 309 F.2d 878 (C.A.7, 1962). In its opinion the Tax Court observed: "It is quite clear that petitioner did not have the protection usually afforded a creditor. The 'debts' owing to petitioner were not evidenced by notes; there is no showing that interest was ever accrued or was intended to be accrued on them; they were unsecured. * * * *" The absence of these features should not weigh in the balance here. The Tax Court found that 50% ownership plus the enforcement of the provisions of the August 13, 1953 agreement and Park Lane's financial condition gave petitioner control over the funds of Park Lane. Petitioner was therefore free to make repayment to itself if and when funds of Park Lane were available, and from time to time petitioner did credit its Park Lane account with having received certain amounts during 1954. Nevertheless, as the Tax Court pointed out, "repayments buttress the argument that advances constitute bona fide debts, but that factor is not conclusive and must be considered with all the evidence. Cf. American-La France-Foamite Corp. v. Commissioner [284 F.2d 723, 725 (C.A.2, 1960)]". Also see Dodd v. Commissioner, 298 F.2d 570, 578 (C.A.4, 1962). There are other factors which justified the Tax Court in not giving this evidence the weight desired by petitioner. It did not explain whether the credits represented repayment in cash or something other than cash, such as inventory transfers, work performed or the allocation of expenses. It made advances in the same month after credits were made in petitioner's books of accounts.

From our reading of the cases involving disputed claims for bad debt deductions, where the taxpayer did not expect the advances to be repaid, or he knew there was a likelihood that they wouldn't the inquiries seem to boil down to these: (1) Were the advances treated like an investment, and (2) At the time they were made, to what degree of risk have the advances been knowingly subjected by the taxpayer in the business venture? Regarding the second inquiry, if the degree of risk may be said to be reasonably equivalent to that which equity capital would bear had an investor, under similar circumstances, made the advances, then the advances may be held not to be loans.

At the time petitioner began to make the advances, Park Lane's financial condition was poor; it could not continue much longer without petitioner's help. Petitioner did not cease to make advances when Park Lane's financial position was deteriorating over the years. As a matter of fact it continued to make advances over a period of seven months after Park Lane had filed its bankruptcy petition for reorganization. Moreover, petitioner wanted to increase Park Lane's volume of business and keep that concern in business, for a short time at least, so that it could use its acquisition of an interest in Park Lane as a selling point for its stock offering to the public.

In its opinion the Tax Court stated: "Furthermore, petitioner assumed a position subordinate to Park Lane's other—and admittedly bona fide—creditors by guaranteeing the obligations to Camden Trust and the debts owing to certain of Park Lane's suppliers. In short, petitioner's conduct was never that of a creditor seeking assurance of unconditional repayment of a bona fide debt." Although subordination of one's right of the collection of a debt to that of another is not controlling in determining that advances are not bona fide debts, it is an important factor in that determination.

11. For some of the important characteristics of a creditor-debtor relationship, see John Wanamaker Philadelphia v. Commissioner, 139 F.2d 644, 647 (3 Cir. 1943).

See P. M. Finance Corporation v. Commissioner, supra, 302 F.2d at pp. 789–799.

The Tax Court further found that "the parties intended that the advances would be repaid only if Park Lane prospered, that the funds advanced were to be put at the risk of Park Lane's business, and that petitioner hoped primarily for an increase in the value of its stock holdings in Park Lane rather than for repayment." Such intentions and hope, which are entirely consistent with those of an investor, were inferences which the Tax Court was clearly permitted to draw from the evidence. The advances were treated like an investment; they were subjected to the same risks as an investment.

The decision of the Tax Court will be affirmed.