T.C. Memo. 2001-158

UNITED STATES TAX COURT

THOMAS AND LINDA O'CONNELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16647-98.                    Filed June 29, 2001.

Thomas and Linda O'Connell, pro se.

<u>Christine V. Olsen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies in,
additions to, and penalties on petitioners' Federal income tax as
follows:

| Year | Deficiency | Additions to Tax/Penalties Sec. 6661(a) | Sec. 6662 |
|------|-----------|-----------|-----------|
| 1987 | $611,053 | $152,763 | - |
| 1988 | 672,765 | 168,191 | - |
| 1989 | 113,278 | - | $22,656 |
| 1990 | 52,462 | - | 10,492 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether amounts petitioners received from two insurance businesses were loans or were taxable distributions; (2) whether petitioners are entitled to deduct losses from fishing activities engaged in by Thomas O'Connell (petitioner) through two S corporations; and (3) whether petitioners are entitled to a business bad debt or a nonbusiness bad debt deduction.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Chula Vista, California, at the time that they filed their petition in this case.

During the years in issue, petitioner owned 75 percent of a corporation named Mayflower Insurance Agency, Inc. (Mayflower). Petitioner was president of Mayflower and in charge of its

operations. Mayflower owned 100 percent of Sabinas Claims Service, Inc., and 100 percent of Texas Premium Finance.

During the years in issue, petitioner owned 100 percent of Jordan General Insurance Agency, Inc. (Jordan), an S corporation, and was involved in a number of other insurance-related enterprises in which he held ownership interests. During the years in issue, each of petitioners received wages from one or more of the insurance-related enterprises.

Advances to Petitioner

During 1986 and 1987, petitioner received advances of $1,175,044 and $1,469,974.40 from Mayflower. During 1988, petitioner received advances of $329,266.66 from Jordan. Petitioner executed promissory notes in the amount of the advances. None of the amounts advanced were ever repaid. The advances were shown on Mayflower's 1987 U.S. Corporation Income Tax Return, Form 1120, as "loans to stockholders". The amounts were not reflected as outstanding at the end of 1988 on Mayflower's corporate tax return for that year, and no loans to stockholders were shown on Jordan's corporate tax return for 1988.

In December 1989, Mayflower and Jordan each filed petitions in bankruptcy. The amounts that were advanced to petitioner were not shown as property of Mayflower or Jordan in the schedules filed in the bankruptcy proceeding.

Fishing Activities

In 1982, petitioner incorporated Billfish, Inc. (Billfish). Billfish elected S corporation status. Billfish purchased an ocean-going yacht, Renegade, for $600,000.

Petitioner is an avid ocean fisherman. He particularly enjoys billfish tournaments. Billfish are large ocean fish with large bills, such as blue marlin, black marlin, and sailfish. During 1983, Billfish advertised Renegade's availability for charter in the New York Times, The San Francisco Examiner, The Chicago Tribune, and the Miami Herald. During 1983, various employees of the entities that were controlled by petitioner were permitted to use the Renegade for one day each. The employees were responsible for their own round trip airfare, food, and miscellaneous items during the trip, although the entity provided lodging.

By the years in issue in this case, Renegade was no longer advertised for charter. As of 1986, when petitioner gave an interview to Marlin magazine, Renegade was not often chartered. During that interview, petitioner stated:

> You have to be in competitive offshore fishing for the sport * * * not the money. What you win could never cover the expenses. That's just a drop in the bucket!
>
> * * * If you're in tournament fishing for the money, you'll go broke.
>
>    *      *      *      *      *      *      *

In my mind, it is inconceivable to make any money at tournament fishing * * *. This is strictly a sport. If a guy only fished one or two tournaments in a year and he won one of them, then he might end up in the black for that year * * *. If you fish them a lot, though, it is really tough.

From 1983 through 1989, Renegade was used primarily for sport fishing. The yacht spent several months each year in and around Cozumel, Mexico; several months each year in and around Cape Cod, Massachusetts; and several months in and around The Bahamas.

Billfish received what was denominated as "management fees" from various entities in which petitioner held an ownership interest. During 1988, those entities made payments to Billfish totaling $220,000. Billfish, however, did not perform any management services for the entities controlled by petitioner, and the fees were mischaracterized on the tax returns filed by those entities. Billfish reported the following gross income, expenses, and income or loss on its Federal income tax returns for the years indicated:

| Year | Gross Income | Expenses | Income(Loss) |
|------|--------------|----------|--------------|
| 1982 | $79,500 | $140,892 | ($61,391) |
| 1983 | 327,808 | 573,754 | (245,946) |
| 1984 | 619,504 | 552,010 | 67,494 |
| 1985 | 519,137 | 658,274 | (139,137) |
| 1986 | 370,385 | 774,665 | (404,280) |
| 1987 | 427,750 | 623,940 | (196,190) |
| 1988 | 338,103 | 547,405 | (209,302) |

In 1984, petitioner incorporated Texas Terrors Fishing Team, Inc. (Texas Terrors), which was owned 100 percent by petitioner and had elected S corporation status. Petitioner and Texas

Terrors entered many tournaments during the years in issue.  The fishing tournaments were funded by moneys advanced to Billfish by petitioner.  Billfish made interest-free loans to Texas Terrors, which were the sole source of funds for Texas Terrors. Petitioner did not charge Billfish interest on the loans.  If Texas Terrors won prizes in fishing tournaments, the money was given to the team members.  The prize money was not reported as taxable income to Texas Terrors.  Texas Terrors reported the following gross income, expenses, and income or loss on its Federal income tax returns for the years indicated:

| Year | Gross Income | Expenses | Income(Loss) |
|------|-------------|----------|--------------|
| 1984 | $25,568 | $154,296 | ($127,728) |
| 1985 | 53,565 | 221,061 | (167,496) |
| 1986 | 49,195 | 81,710 | (32,515) |
| 1987 | – | 40,681 | (40,681) |
| 1988 | – | 59,432 | (59,432) |

Billfish did not file timely Federal income tax returns for 1989 or 1990, and Texas Terrors did not file a timely return for 1989.  Billfish did not maintain records sufficient to substantiate the travel expenses, meals and entertainment expenses, and other expenses of operating Renegade during the years in issue.

Losses incurred by Billfish and by Texas Terrors were deducted against other income of petitioners on their Federal income tax returns for the years in issue.

On February 8, 1989, petitioner sold <u>Renegade</u> for a net price of $472,000. <u>Renegade</u> had been fully depreciated, so the entire net sales proceeds were taxable to petitioners as capital gain. The capital gain on the net sales proceeds was not reported on the returns that were filed by petitioner or by Billfish for 1989.

<u>Loan Guaranty</u>

Petitioner received wages of $121,000 and $142,500 from Mayflower during 1987 and 1988, respectively. Linda O'Connell received annual wages of $30,000 from Mayflower during 1987 and 1988. Petitioner received wages from other entities of $180,000 in 1988 and $470,000 in 1989, and Linda O'Connell received wages from Jordan in the amount of $30,000 in 1989.

On November 7, 1988, Mayflower borrowed $950,000 from Bent Tree National Bank. The loan was guaranteed by petitioner. The note became due on February 6, 1989, but Mayflower defaulted. The lender seized $7,600.97 from petitioner's bank account and a $100,000 certificate of deposit in partial satisfaction of the guaranty. Petitioners deducted $100,000 as a bad debt on a Schedule C, Profit or Loss From Business, attached to a second amended tax return filed for 1990.

Miscellaneous Schedules A and C Deductions

On Schedule A, Itemized Deductions, for 1987, petitioners claimed legal and accounting expenses totaling $160,503 and subscription expenses of $182.

On Schedule C for 1988, petitioners claimed deductions, including the following:

| | |
|---|---|
| Dues and publications | $125 |
| Freight | 74 |
| Rent | 42,185 |
| Travel | 49,737 |
| Meals & entertainment | 17,962 |
| Utilities & telephone | 1,695 |

Petitioners did not maintain books or records to substantiate the foregoing expenses.

OPINION

Respondent treated the advances that petitioner received from the insurance-related entities as income, rather than as loans. Respondent contends that the fishing activities of petitioner were disguised as businesses in order to allow petitioner to deduct for tax purposes his very expensive hobby. Alternatively, respondent argues that petitioners did not substantiate the expenses of those activities, particularly the travel and entertainment and "facility" expenses that were subject to section 274(d). Respondent contends that the amounts paid by petitioners in relation to the loan guaranty have not been substantiated beyond the $7,600 amount supported by documentation and that, in any event, the amount would be a

nonbusiness bad debt.  Respondent further contends that the additional expenses in dispute were not substantiated as to amount or business purpose and that petitioners' negligence in reporting items on their returns and in understating their tax liabilities supports the additions to tax and penalties determined by respondent.

Petitioner contends that the advances from his insurance-related entities were bona fide loans; that the fishing activities were a charter business; and that the loan guaranty was intended to protect petitioners' salaries from Mayflower. Petitioners presented neither evidence nor argument relating to the remaining deductions or the additions to tax and penalties. Thus, petitioners are deemed to have abandoned those issues.  In any event, deductions cannot be allowed in the absence of evidence that shows the expenses were incurred and the purpose for which they were incurred.  The concessions by petitioners as to mischaracterized and improper deductions support the additions to tax and penalties in each year.

With respect to the other issues, petitioner testified at trial.  His testimony was not corroborated by any other witnesses and was, to some extent, contradicted by the documentary evidence.  We need not accept uncontroverted testimony at face value if it is improbable, unreasonable, or questionable, see, e.g., Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th

Cir. 1972), affg. T.C. Memo. 1970-335, or, if the totality of the evidence conveys a different impression, see Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 731 (3d Cir. 1963), affg. T.C. Memo. 1962-132; Gerald D. Roberts Consultants, Inc. v. Commissioner, T.C. Memo. 1991-490, affd. without published opinion 981 F.2d 1251 (4th Cir. 1992); Houston v. Commissioner, T.C. Memo. 1983-635.

## Advances to Petitioner

Whether the advances from Mayflower and Jordan to petitioners were taxable distributions, as respondent contends, or loans, as petitioners contend, depends on whether repayment of the amounts was intended by petitioners and Mayflower and Jordan at the time that the amounts were advanced. Notwithstanding the formality of executing notes from petitioners to the corporations, the other facts and circumstances surrounding the advances may negate the intent to create a bona fide debt. See Estate of Chism v. Commissioner, 322 F.2d 956 (9th Cir. 1963), affg. T.C. Memo. 1962-6; Diamond Bros. Co. v. Commissioner, supra at 731; Clark v. Commissioner, 266 F.2d 698, 710-711 (9th Cir. 1959), affg. in part and remanding on another issue T.C. Memo. 1957-129. In view of petitioner's unfettered control over Mayflower and Jordan, special scrutiny of the circumstances is required. Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1338-1339 (1971), affd. without published opinion 496 F.2d 876

(5th Cir. 1974); <u>Haber v. Commissioner</u>, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970).

The unexplained inconsistencies in not reporting the outstanding loans as due from petitioners on the corporate tax returns and on the bankruptcy schedules filed by Mayflower and by Jordan contradict the formality of the notes. There is no evidence that there was ever any effort to repay the advances, and no payments in fact were made. There is no indication that petitioners had the ability to repay the advances, and the evidence and petitioners' arguments suggest that in fact they did not have the ability to repay the advances. We conclude on the evidence presented that the advances were taxable distributions to petitioners rather than bona fide loans.

<u>Fishing Activities</u>

The first of respondent's alternative grounds for disallowing deductions claimed in relation to the fishing activities operated through the S corporations Billfish and Texas Terrors is the absence of the requisite profit objective within the meaning of section 183. A determination of whether the requisite profit objective exists is made on the basis of all of the surrounding facts and circumstances. See sec. 1.183-2(b), Income Tax Regs. Greater weight is given to the objective facts than to the taxpayer's mere statement of his intent. See sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows:

(1) Manner in which the taxpayer carries on the activity.

(2) The expertise of the taxpayer or his advisors.

(3) The time and effort expended by the taxpayer in carrying on the activity.

(4) Expectation that assets used in activity may appreciate in value.

(5) The success of the taxpayer in carrying on other similar or dissimilar activities.

(6) The taxpayer's history of income or losses with respect to the activity.

(7) The amount of occasional profits, if any, which are earned.

(8) The financial status of the taxpayer.

(9) Elements of personal pleasure or recreation.

These factors are not intended to be exclusive, and no one factor or majority of the factors need be considered determinative. See Golanty v. Commissioner, 72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Petitioner, during his testimony, repeatedly claimed that the Billfish activity was a business. He claimed that certain identified employees of the insurance entities used the yacht.

There was no evidence, however, as to the dates on which any of the individuals were on the yacht, and there was no corroboration of petitioner's broad assertions. Although the record supports a finding that petitioner spent a great deal of time and effort in the activity, none of the other factors listed above favors petitioners.

In this case, the most persuasive evidence is the history of income or losses incurred with respect to the activities and the absence of any profit, i.e., factors (6) and (7) above. Petitioner's own words, quoted in the interview published in 1986, indicate that profits would be unusual and unexpected. The evidence of actual losses claimed, without any indication of a means of recouping any of them, compels the conclusion that the activity was not engaged in for profit. We conclude that petitioner lacked the requisite profit objective and that respondent correctly characterized the activity as a personal hobby of petitioner.

In view of our conclusion as to the lack of the requisite profit objective, it is not necessary to address respondent's alternative contention that the expenses were not properly substantiated.

Bad Debt Expense

In the statutory notice of deficiency, respondent determined that the $100,000 amount claimed by petitioners for 1990 as a

business bad debt should be reclassified as a nonbusiness bad debt and included as a short-term capital loss.  In requests for admissions served on petitioners, respondent asked petitioners to admit:

> 51.  On their 1990 income tax return, petitioners deducted $100,000, the amount of the seized certificate of deposit, as an expense; this amount should have been claimed as a "non-business bad debt" rather than as an expense.

Respondent now contends that petitioners have not substantiated that a total of $100,000 was seized by Bent Tree National Bank. Petitioner, at trial, was under the impression that respondent had previously conceded substantiation of the $100,000 amount, and petitioner only belatedly and ineffectively attempted to subpoena the records of Bent Tree National Bank.

Under the circumstances, we believe that substantiation of the $100,000 amount is new matter as to which respondent has the burden of proof.  See Rule 142(a).  Petitioner testified that he had a certificate of deposit with the bank that was seized in satisfaction of his guaranty.  Respondent has given us no reason to reject petitioner's testimony as to this item.

With respect to the characterization of the amount petitioner paid as a result of his guaranty, petitioner testified:

> there's so much law on this, and I've read it, but the primary and dominant reason that this loan was made was to save my salary, which I think was a hundred and--a hundred and sixty or seventy thousand one year, and the

> year before it was a hundred and forty thousand. And
> that was the reason for this loan. And I should be
> allowed an ordinary loss on this.

Petitioner relies on Lundgren v. Commissioner, 376 F.2d 623 (9th Cir. 1967), revg. T.C. Memo. 1965-314. In that case, however, the taxpayer was independently in the business of selling timber. Here, it was Mayflower, not petitioner, that was in the business of selling insurance. The taxpayer in Lundgren did not claim that the purpose of the loan was to protect his salary from a corporation. See Dallas v. Commissioner, T.C. Memo. 1971-248; cf. Jerich v. Commissioner, T.C. Memo. 1992-136; Brooks v. Commissioner, T.C. Memo. 1990-259. Petitioner's conclusory testimony is not supported by objective facts.

Whether a debt is a business or nonbusiness debt depends on whether it is "proximately related" to a trade or business of the taxpayer, as determined based on the dominant motivation of the taxpayer in incurring the debt. United States v. Generes, 405 U.S. 93, 104 (1972). In determining the dominant motivation of a taxpayer who is both employee and shareholder, objective factors to be considered are the size of the taxpayer's investment in the corporation; the size of the salary received from the corporation; other sources of gross income available to the taxpayer; the ability of the corporation to remain in business absent the taxpayer's guaranty; and the degree to which the taxpayer's employment is protected by his or her equity position

in the corporation.  See id.; Benak v. Commissioner, 77 T.C. 1213, 1218 (1981).  Considering these factors in the present case, it is more probable that petitioner's guaranty was intended to protect his investment in Mayflower than it was to protect his salary from a corporation that he wholly controlled.  The amount of the loan guaranty was disproportionate to petitioner's salary from Mayflower and is more likely related to his investment in Mayflower.  Petitioner even asserts in his brief:

> As a result of an adverse loss ratio in 1988, it was required that Mayflower/Jordan pay back a large amount of money to Constitution Reinsurance. Mayflower/Jordan did not have the funds at the time, so the petitioner secured a loan that was passed on to the corporation.  If the monies had not been paid to Constitution, they would have withdrawn their reinsurance support.  This action would have put Mayflower/Jordan out of business immediately.
>
>    *    *    *    *    *    *    *
>
> The loan was essential if the company was to continue to operate.

We conclude that the bad debt deduction must be treated as a nonbusiness bad debt.

We have considered the other arguments of the parties.  They are either unnecessary to our decision or lacking in merit.

Decision will be entered

under Rule 155.