ZILKHA & SONS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JEROME L. STERN AND JANE STERN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1902–66, 1995–66. Filed July 2, 1969.

*Victor S. Friedman, Richard O. Loengard, Jr.,* and *Michael P. Oshatz,* for the petitioner in docket No. 1902–66.
*Harry Malter,* for the petitioners in docket No. 1995–66.
*Rudolph J. Korbel* and *Marwin A. Batt,* for the respondent.

OPINION

The sole issue to be decided in this case is whether the payments received by the petitioners are interest or distributions with respect to stock. The petitioners take the position that their investment in Charlottetown was in form and in substance an acquisition of stock so that the payments which they received were nontaxable distributions since Charlottetown had no earnings and profits in the years of the distributions. On the other hand, the respondent determined that the investment was in substance a loan so that the payments were taxable as interest.

Although the traditional positions of the parties in a debt-equity controversy are reversed in this case, the applicable law is the same. We must examine the investment and all the surrounding circumstances to determine what relationships were in substance created. *Ambassador Apartments, Inc.*, 50 T.C. 236 (1968), affd. 406 F. 2d 288 (C.A. 2, 1969). The investment took the form of an acquisition of preferred stock, but the petitioners arranged to provide themselves with rights not traditionally accruing to stockholders. These additional rights provided them more certainty that their investment would be returned and that they would receive earnings thereon. As a result of these additional rights, we have a highly complex arrangement which is neither fish nor fowl—neither traditional debt nor equity. Yet, despite the unusual protection given the petitioners, we

have concluded that the arrangement more resembles the acquisition of stock rather than the making of a loan. Primarily, we are led to this conclusion because of the parties' treatment of the transaction, and because the petitioners have assumed the risks of investors in equity.

The petitioners, Charlottetown, and CRD all treated the investment as a purchase of preferred stock. This treatment has been consistently carried through in documents relating to the purchase of the Preferred Stock, tax returns, financial statements, minutes of Charlottetown and CRD boards of directors meetings, and the amended articles of incorporation of Charlottetown. Of course, the treatment of a transaction by the parties to it is not dispositive of the issue, but it is some indication of the petitioners' intention in purchasing the Preferred Stock. *Milwaukee & Suburban Transport Corporation* v. *Commissioner*, 283 F. 2d 279, 283 (C.A. 7, 1960), reversed on other grounds 367 U.S. 906 (1961); *John Wanamaker Philadelphia* v. *Commissioner*, 139 F. 2d 644, 646 (C.A. 3, 1943); *Santa Anita Consolidated, Inc.*, 50 T.C. 536, 550 (1968); *Bolinger-Franklin Lumber Co.*, 7 B.T.A. 402, 405–406 (1927).

At the time of Zilkha's investment, Charlottetown's stockholder equity account showed a deficit of $277,415.[1] This deficit was comprised of a capital account of $1,000 representing proceeds from the sale of 100[2] shares of common stock to CRD and an earnings deficit of $278,415. In addition to its equity deficit, Charlottetown had total liabilities of $4,740,758 (of which $1,109,556 was owed to its parent company, CRD), as compared with assets of only $4,463,343. The evidence indicates that pursuant to the provisions of the stock purchase agreement, the proceeds of the Preferred Stock sale were used to satisfy most of the Charlottetown debt owing to CRD.

Although Charlottetown's prospects for successful operations were generally favorable in 1960, success was not then assured. Charlottetown Mall had only been in operation since 1959; it had sustained operating losses in its first year of business; its income depended to a large extent on the success of its tenants, since many of the leases provided for rentals based in part on sales. Inasmuch as there was no capital cushion under the Preferred Stock, the success of the petitioners' investment, as of September 10, 1960, depended largely on the

---

[1] The record does not contain precise financial data for Charlottetown as of Sept. 10, 1960. However, such data has been supplied for Aug. 31, 1960. Since the evidence indicates that no significant change in Charlottetown's financial condition occurred between August 31 and September 10, we have treated the August 31 figures as also being applicable to September 10.

[2] Charlottetown's articles of amendment to its articles of incorporation, as well as creating the Preferred Stock, also provided for a 10-for-1 stock split of its common stock. Thus, prior to the amendment, CRD owned 100 of 1,000 authorized shares of Charlottetown common stock; after the amendments, CRD owned 1,000 of 10,000 authorized shares.

success of the Charlottetown business. Cf. *Milwaukee & Suburban Transport Corporation* v. *Commissioner*, 283 F. 2d at 282–283; *Malone & Hyde, Inc.*, 49 T.C. 575 (1968).

We find it impossible to believe that Zilkha would have made a loan of a million dollars when CRD provided so little equity and had a large prior claim for loans to Charlottetown. If Zilkha intended its purchase of the Preferred Stock to be a loan, we think it would have insisted that CRD's debt be either subordinated to the Preferred Stock or capitalized. The use of the Preferred Stock proceeds to pay off Charlottetown's indebtedness to CRD is inconsistent with the contention that the Preferred Stock is a debt security.

The respondent contends that the petitioners' risk is illusory, since the holders of the Preferred Stock acquired various protections under the stock purchase agreement and the amended articles of incorporation of Charlottetown that tend to assure payment of dividends and redemption. The most important of these protections are the following: (1) The right of holders of the Preferred Stock to take over Charlottetown in the event of the failure to pay Preferred Stock dividends or the failure to redeem the Preferred Stock; (2) the obligation of CRD to make certain loans to Charlottetown; and (3) the subordination of certain prospective debts of Charlottetown, in varying degrees, to the Preferred Stock. However, these provisions do not substantially reduce the risk inherent in the Preferred Stock.

The acquisition by the holders of the Preferred Stock of voting control and complete stock ownership of Charlottetown, in the event of nonpayment of dividends or the failure to redeem, does not assure the payment of the dividends or the redemption of the stock. If Charlottetown prospers, CRD, as the controlling stockholder, will surely see to the redemption of the Preferred Stock. The Preferred Stock is an outstanding interest in Charlottetown which poses a potential threat to CRD's continuing control and ownership and can presently restrict Charlottetown's activities in various ways. On the other hand, if Charlottetown does not succeed and cannot pay dividends and redeem the Preferred Stock from its own resources, CRD is not likely to provide the funds necessary for it to retain control and ownership of Charlottetown. The respondent argues that CRD will in all events see to the payment of dividends and the redemption of the Preferred Stock, since if it does not do so, it will lose its investment in Charlottetown. However, CRD's investment in Charlottetown has been principally by way of debt rather than stock—CRD paid only $800 for all the Charlottetown stock it owns. That CRD would pay $1,200,000 to protect an investment of $800 in a failing company seems highly unlikely.

The stock purchase agreement obligates CRD to make the following loans to Charlottetown: (1) Loans enabling Charlottetown to discharge certain liens against Charlottetown Mall; (2) loans allowing

Charlottetown to redeem a portion of the Preferred Stock in the event certain tenants terminate their leases and satisfactory replacements are not found; and (3) loans enabling Charlottetown to pay Preferred Stock dividends until Charlottetown achieves a "net cash flow" for 2 consecutive years. The loans which CRD is required to make to Charlottetown do tend to assure the payment of dividends and the redemption of the Preferred Stock. However, the question is whether such loans substantially reduce the petitioners' risk, and we believe they do not. The contractor and subcontractor liens constitute only one source of financial difficulty to Charlottetown. The discharge of such liens is no assurance that Charlottetown will be able to discharge its other liabilities or that it will prosper. The provisions with respect to terminating tenants apply to only 3 tenants out of more than 50, and only if those tenants terminate their leases under specific circumstances. That only 3 tenants are involved and that those tenants may never terminate their leases under the prescribed conditions minimizes the assurance to the holders of the Preferred Stock that their investment will be successful. The requirement that CRD loan Charlottetown sufficient funds to pay Preferred Stock dividends until Charlottetown achieves a "net cash flow" for 2 consecutive years is the most substantial protection accorded the Preferred Stock. If Charlottetown remains solvent and its stated capital continues unimpaired,[3] this loan requirement more or less assures the payment of dividends until Charlottetown becomes a going concern. However, it does not assure that Charlottetown, once it achieves a "net cash flow" for 2 consecutive years, will continue to be a going concern. Furthermore, it has no effect in assuring the redemption of the Preferred Stock.

Nor is the provision for the subordination of some loans to the Preferred Stock inconsistent with the conclusion that the stock represents an interest in equity. On September 10, 1960, it did not appear certain that a substantial portion of future Charlottetown debt would be of a kind that had to be subordinated to the Preferred Stock. As of May 31, 1961, at least $3,242,463 of Charlottetown debt was not subordinated to the Preferred Stock, whereas less than $82,765 was so subordinated. As of May 31, 1962, at least $3,924,020 of Charlottetown debt was not subordinated to the Preferred Stock, whereas approximately $677,696 was so subordinated.[4] Although some Charlottetown debt to CRD was subordinated to the Preferred Stock after Septem-

---

[3] Sec. 37 of Maryland's corporation law prohibits the declaration or payment of dividends when a corporation is insolvent or would be rendered insolvent by the dividend payment, or when its stated capital is impaired or would be impaired by such payment. Md. Ann. Code art. 23, sec. 37 (1966). It seems relatively clear that the Preferred Stock should be treated as stock for purposes of Maryland law. *Kraft* v. *Rochambeau Holding Co.*, 210 Md. 325, 123 A. 2d 287, 289–290 (1956). The respondent does not contend otherwise.

[4] The evidence indicates that most of this subordinated debt was not absolutely subordinated to the Preferred Stock. The subordination was subject to lapsing, and did in fact lapse, upon the occurrence of certain events.

ber 10, 1960, we cannot conclude that such subordination altered the basic relationship between CRD and the petitioners. CRD has always had a severely limited equity investment in Charlottetown. Upon Zilkha's purchase of the Preferred Stock and the discharge of a substantial part of the CRD debt, CRD's investment in Charlottetown was reduced far below that represented by the Preferred Stock. Even had the CRD debt remained outstanding, it would have been a prior claim to the Preferred Stock.

Of all the significant investments in Charlottetown, the Preferred Stock was the most dependent on the success of the business. The various protections accorded the Preferred Stock do not substantially minimize the petitioners' risk. Because of this risk and the consistent treatment of the Preferred Stock as equity, we conclude that the payments received by the petitioners from Charlottetown were distributions with respect to stock and not interest.

The parties have argued extensively whether the petitioners have any effective right to participate in the management of Charlottetown, whether the arrangements for the redemption of the Preferred Stock constitute in effect a fixed maturity date, and whether the practical effect of the provisions for the payment of dividends guarantee that such payments will be made. However, the arguments concerning these provisions are not highly persuasive.

(1) *Participation in Management.*—The petitioners contend that their right to elect 2 of the 14 directors allows them to participate in Charlottetown's management, and indicates that the Preferred Stock is equity. *Ernst Kern Co.*, 1 T.C. 249, 271 (1942). On the other hand, the respondent disputes that this right gives the petitioners any effective opportunity to participate in management and argues that it merely provides means for the creditor to watch over his investment. *Wilbur Security Co.*, 31 T.C. 938, 951 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960); *Estate of Ernest G. Howes*, 30 T.C. 909, 924 (1958), affirmed sub nom. *Commissioner* v. *Johnson*, 267 F. 2d 382 (C.A. 1, 1959); *Holyoke Mutual Fire Insurance Co.*, 28 T.C. 112, 117–118 (1957).

The record shows that the Preferred Stock directors have taken an active role in the affairs of Charlottetown, and the fact that the holders of the Preferred Stock have some opportunity to participate in management is more indicative of an equity interest than of a creditor's rights. Nevertheless, the fact that CRD controls 12 seats on the board of directors, as opposed to only 2 controlled by the holders of the Preferred Stock, significantly reduces the power of the latter group to influence management decisions, and prevents us from heavily relying on this factor in favor of the petitioners.

(2) *Maturity Date.*—It has been said that a fixed maturity date is a highly significant characteristic of debt. *Parisian, Inc.* v. *Commissioner*, 131 F. 2d 394, 395 (C.A. 5, 1942). The petitioners observe that there is no legally enforceable obligation to redeem the Preferred Stock, and that such a redemption is prohibited when Charlottetown is insolvent or would thereby be rendered insolvent. Md. Ann. Code art. 23, sec. 32 (1966); see fn. 3, *supra*. The petitioners conclude that the Preferred Stock does not contain a fixed maturity date. See *United States* v. *South Georgia Ry. Co.*, 107 F. 2d 3 (C.A. 5, 1939). On the other hand, the respondent argues that if the Preferred Stock is not redeemed by September 1, 1970, the holders of the Preferred Stock will be able to take over the management of Charlottetown and acquire all its common stock for the nominal sum of $800.

In some cases, it may be clear from the surrounding circumstances that there is in effect a fixed maturity date even in the absence of such a contractual provision. See *Comtel Corp.*, 45 T.C. 294 (1965), affd. 376 F. 2d 791 (C.A. 2, 1967), certiorari denied 389 U.S. 929 (1967). However, the circumstances of this case do not indicate that a redemption is assured. If Charlottetown prospers, the Preferred Stock will of course be redeemed, but if it fails, CRD will merely walk away from the enterprise and leave it to the holders of the Preferred Stock. As of September 10, 1960, CRD's investment in Charlottetown was not such as in practical effect to cause it to arrange for the redemption of the Preferred Stock in order to protect its investment. Nor were the indications of success so strong as to make redemption of the Preferred Stock inevitable.

It is apparent that the holders of the Preferred Stock have rights which render its redemption more probable than typical preferred stock. Yet, the chances of redemption of the Preferred Stock are not so great as to indicate that in fact there was a fixed maturity date for the repayment of the investment.

(3) *Contingency of Dividends.*—The respondent contends that the so-called dividends are not subject to the customary contingencies applicable to dividends but are in fact required to be paid. In support of this argument, he points to the following facts: (a) The dividends are payable out of surplus and Zilkha's purchase of 12,000 shares of $1 par Preferred Stock for $100 per share created $1,188,000 of capital surplus; (b) CRD is required to loan Charlottetown the funds with which to pay dividends until Charlottetown achieves a "net cash flow" for 2 consecutive years; (c) the dividends are cumulative; and (d) if the dividends are not paid within 30 days, the holders of the Preferred Stock can take over the corporation and can purchase CRD's common stock for a nominal amount.

The effect of these provisions is to enhance the likelihood of the payment of dividends. The existence of large amounts of surplus means that dividends can be declared; the possibility of losing control of the corporation, if they are not declared, creates a strong incentive for the board to declare them. Furthermore, CRD's obligation to loan the necessary funds means that cash would be available to pay dividends.

On the other hand, if Charlottetown becomes insolvent, payment of the Preferred Stock dividends will be prohibited by applicable State law; [5] and on the basis of the evidence before us, it appears that Charlottetown could become insolvent under such law. In addition, CRD's obligation to advance the funds for the payment of dividends terminates once Charlottetown obtains a "net cash flow" for 2 consecutive years.[6] Thus, the payment of dividends on the Preferred Stock is subject to the contingencies of Charlottetown's solvency, and the availability of cash after Charlottetown achieves the "net cash flow."

The rights of the preferred stockholders are unusual and significantly increase the likelihood that dividends will be paid. However, these rights do no justify our concluding that dividends are in fact required to be paid.

The respondent makes much of an alleged tax avoidance purpose behind the creation of the Preferred Stock. He states that the petitioners were tax-conscious individuals who sought to avoid the tax consequences of ordinary income. They knew that Charlottetown had no earnings and profits and was likely to have none for a substantial period of time. They also knew that Charlottetown was not in need of interest deductions to reduce its Federal income taxes. Accordingly, they structured the transaction so as to make it appear that the Preferred Stock is equity. However, our task is to determine what relationships were in fact created by these transactions and to apply to them the appropriate tax consequences. We have examined the stock purchase agreement and all the surrounding circumstances and concluded that in substance the petitioners acquired preferred stock. The fact that the petitioners gain certain tax benefits because their investment was in preferred stock does not justify our disregarding the substantive nature of the transaction.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

[5] See fn. 2, *supra.*

[6] Charlottetown achieved such a net cash flow by the end of its fiscal year ending May 31, 1966.