Little Carnegie Realty Corporation v. Commissioner.
Little Carnegie Realty Corp. v. Commissioner
Docket No. 3592-67
United States Tax Court
T.C. Memo 1970-150; 1970 Tax Ct. Memo LEXIS 210; 29 T.C.M. (CCH) 647; T.C.M. (RIA) 70150; June 10, 1970, Filed Leonard I. Weinstock and David M. Garelik, 6 E. 39th New York, N.Y., for the petitioner. Marvin E. Hagen and Stanley J. Goldberg, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency of $3,551.23 in petitioner's income tax for its taxable year ended April 30, 1964. The sole issue for our determination is whether petitioner should be treated as having realized $12,982.00 *211 in additional rental income, representing the excess of rent received from a sublessee by petitioner's sister corporation, which leased and operated a theater owned by petitioner, over the rent paid by the sister corporation to petitioner. Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner Little Carnegie Realty Corporation (hereinafter petitioner) is a New York corporation organized in 1946, which maintained its principal office in New York, New York, at the time of filing the petition herein. It filed a corporate Federal income tax return for its taxable year ended April 30, 1964 with the district director of internal revenue, Manhattan, New York. Jean and Jula Goldwurm are husband and wife and have been petitioner's sole shareholders since its formation, and Jean serves as petitioner's president. Petitioner owns the land and building situated at 144-146 West 57th Street, and 139-143 West 56th Street in New York City, which building contains offices, a store, an art gallery, and the Little Carnegie Theatre. The Little Carnegie Theatre was subject to a long-term lease when petitioner acquired the building in 1946. That lease was terminated *212 on December 31, 1951 by way of assignment from the lessee to the Little Carnegie Theatre, Inc. (hereinafter Theatre), a New York corporation organized in 1950 for the purpose of operating the Little Carnegie Theatre. Its sole stockholders from the time of its formation until its 648 liquidation in August 1963 were Jean and Jula Goldwurm, and Jean served as president. On October 18, 1950, petitioner and Theatre entered into a lease of the Little Carnegie Theatre for motion picture exhibitions for a term of 10 years commencing January 1, 1952. Theatre agreed to pay to petitioner an annual rental of the greater of 17 i/2 percent of the gross receipts derived from the theater business or $36,500. The lease was on the standard form of store lease provided by the Real Estate Board of New York, Inc., without significant modification. Petitioner executed an agreement with Theatre on June 29, 1951, whereby petitioner agreed to enter into a contract with a construction firm on behalf of Theatre for alterations and improvements to the Little Carnegie Theatre costing approximately $400,000, which Theatre agreed to pay and did pay. Petitioner and Theatre agreed on December 30, 1954 that *213 the rental for the period January 1, 1954 through December 31, 1956 would be at the rate of $700 per week and that the maximum rental of 17 i/2 percent of gross receipts, as specified in the lease, would not apply to this period. On April 24, 1957, petitioner and Theatre agreed that the rental of $700 per week would be reduced to $600 per week for the remainder of the lease, to wit, until December 31, 1961. Theatre reported the following information on its corporate income tax returns for the periods indicated: Taxableyear ended
Theatre'sgross receipts
Rental paid topetitioner
9-30-58
$245,760
$29,600
9-30-59
288,493
20, 800
9-30-60
247,958
20,800
9-30-61
379,028
31,200
9-30-62
287,210
20,400
[1] 8-31-63
173,552
25,400
On October 26, 1961, petitioner and Theatre agreed to extend the lease of October 18, 1950 for an additional term of 10 years, covering the period January 1, 1962 through December 31, 1971, on the same terms and conditions except that the rental was fixed at *214 $36,500 per year based on $100 per day. During the fall of 1962, Jean Goldwurm was contacted by one Ely Landau with respect to the sale of the Little Carnegie Theatre business. Goldwurm indicated that he had no interest in the sale. Because of deteriorating business conditions in late 1962, Goldwurm re-established contact with Landau in the winter of 1963, which led to a meeting between them in February of that year. Thereafter, a series of meetings between Goldwurm and Landau resulted in an agreement on March 21 with respect to basic terms of an arrangement for the acquisition of Theatre's goodwill, the use of Theatre's name, and the lease of the premises for expanded exhibition of new types of motion pictures, screen presentation of sports events, and other entertainment or public interest programs and closed circuit televised programs. Because the prospective lessee was expected to be in a better business position than Theatre, principally because of greater availability to it of expanded exhibition materials, it was anticipated that substantially increased receipts would be obtained. A formal agreement was executed on May 13, 1963 between Theatre and Second Theatre Cinema Corporation *215 (hereinafter Second), a New York corporation organized on May 1, 1963, which required Theatre to secure petitioner's consent to the sublease to Second and provided, among other things, as follows: (a) Theatre agreed to sublet to Second the Little Carnegie Theatre premises for a term of 21 years, to begin on July 1, 1963 and to end on June 30, 1984, at annual rentals subject to the terms of the main lease of January 2, 1963, as follows: (1) $52,178.40 (or $4,348.50 per month) for the first three years of the term, to wit, from July 1, 1963 to June 30, 1966; (2) $73,832.40 ($6,152.70 per month) for the next five years of the term, to wit, from July 1, 1966 to June 30, 1971; and (3) $67,832.40 ($5,652.70 per month) for the balance of the term, to wit, from July 1, 1971 to June 30, 1984; (b) Theatre agreed to sell to Second its goodwill in the operation and conduct of its business known as "Little Carnegie Theatre" for a price of $90,000; and (c) Theatre agreed to sell to Second the right to the limited use of the name "Little Carnegie Theatre" for a term of 21 years from July 1, 1963 for a price of $90,000. The sublease was made subject to a lease agreement, dated as of January 2, 1963 and *216 executed in early May 1963, between petitioner and Theatre providing for the lease of the theater premises for a 649 term of 21 years and two months commencing May 1, 1963 and terminating June 30, 1984 (the same date on which the lease between Theatre and Second would terminate), at an annual rental of $36,600. The lease agreement contained other provisions which represented substantial modifications of the previously used standard form of lease beneficial to petitioner. Theatre adopted a plan of complete liquidation on April 15, 1963 and thereafter completely liquidated pursuant to the provisions of section 337, I.R.C. 1954. Upon Theatre's liquidation, all of its assets and liabilities, including the lease between petitioner and Theatre and the sublease between Theatre and Second, were distributed to Theatre's stockholders, Jean and Jula Goldwurm. Ultimate Finding of Fact The amount of $36,600 constituted a reasonable rental arrangement as between petitioner and Theatre and should be recognized without regard to the arrangements between Theatre and Second. Opinion The frame of reference herein is a narrow one. Respondent does not attack the existence of petitioner or *217 of Theatre as sham entities. Nor does he directly attack the rental arrangement between petitioner and Theatre prior to 1963. His claim is that, in light of the arrangements made between Theatre and Second in May 1963 of which petitioner had full knowledge in advance, petitioner would not have entered into the long-term lease with Theatre as of January 2, 1963, if Theatre had been controlled by an independent third party. Respondent rests his position exclusively on section 61; [1] he has made no contention with respect to the application of section 482 and accordingly we will give no consideration to that section. Petitioner contends that Theatre had an independent legal and financial stake in the arrangements with Second and that the lease and sublease therefore served a legitimate business purpose and should be recognized. We agree *218 with petitioner. In so doing, we recognize that transactions among taxpayers that are owned and controlled by the same interests should be carefully scrutinized. See Kraft Foods Company v. Commissioner, 232 F. 2d 118, 123 (C.A. 2, 1956); C.M. Gooch Lumber Sales Co., 49 T.C. 649, 656 (1968). But, at the same time, such transactions will not be disturbed solely for that reason if they in fact conform to acceptable business requirements. Zilkha & Sons, Inc., 52 T.C. 607 (1969); Malone & Hyde Inc., 49 T.C. 575 (1968). In the instant case, Theatre was the lessee under an existing lease between it and petitioner at the time of the negotiations with Second. That lease had been concluded more than a year earlier and in early 1963 it had nine years remaining of its term. Theatre had every right to insist on continuing with that lease in an endeavor to make the operations of the theater profitable and to recoup the substantial investment which it had made in 1950. Petitioner presented an expert witness who testified that the annual rent under both that lease and the January 2, 1963 lease represented the reasonable rental value of the premises. *219 [2] Respondent presented no direct evidence whatsoever on this aspect of the case, relying entirely on the fact that the taxpayer has the burden of disproving the correctness of his determination, as he was entitled to do. Welch v. Helvering, 290 U.S. 111, 115 (1933); Flomarcy Company, Inc. v. Commissioner, 324 F. 2d 730 (C.A. 2, 1963), affirming per curiam a Memorandum Opinion of this Court; Brown v. Commissioner, 141 F. 2d 307, 309 (C.A. 2, 1944), affirming 1 T.C. 760 (1943). We are, of course, not bound to accept the testimony of petitioner's witness simply because it is uncontradicted. Wood v. Commissioner, 338 F. 2d 602 (C.A. 9, 1964), affirming 41 T.C. 593 (1964). But we found the witness to be qualified and convincing and we therefore are not disposed to disregard his testimony. Under the foregoing circumstances, we think it was entirely proper for Theatre to protect its interests by insisting on a continuation of its arrangements with petitioner 650 subject only to such *220 modification as would not impair those interests. By the same token, petitioner was under no obligation to extend the term of or otherwise modify the existing lease arrangement with Theatre. Obviously, however, in light of the prospective arrangements between Theatre and Second, it was in petitioner's interest to do so. By virtue of such arrangements, it expected to get a greater assurance that the undertakings of Theatre would be honored - a not insignificant consideration in light of Theatre's previous inability to pay the stipulated rent. Beyond this, Second was willing to provide Theatre, and thus petitioner, with an expanded use of the facilities and with other substantial benefits, including a right of cancellation, a tax escalation clause, and the obligation to pay for all alterations, improvements, repairs, etc. That Second was willing to pay a premium over what would otherwise be considered a reasonable rental value for the premises is beside the point. It was in a better position to obtain exhibition material and it expected to profit substantially from an expanded use of the facilities. Nor do we consider the fact that Theatre was promptly liquidated to be of any significance. *221 The question before us is whether the arrangements between petitioner and Theatre were valid and subsisting. If they were, the subsequent liquidation was immaterial, even if there were certain tax benefits to be derived therefrom. See Zilkha Sons, Inc., supra, 52 T.C. at p. 618. In this connection, we note that, although respondent suggests that such benefits were obtained, we were not enlightened in any way, either by testimony or on brief, as to how this may have occurred. Similarly, we reject respondent's attempt to limit business purpose to corporate business purpose as distinct from shareholder business purpose. [3] Where there are, in fact, valid business considerations, the line between corporate and shareholder purpose is nebulous, to say the least. See Perry S. Lewis, 47 T.C. 129, 135 (1966). Respondent relies heavily upon 58th Street Plaza Theatre, Inc., 16 T.C. 469 (1951), affd. 195 F. 2d 724 (C.A. 2, 1952). But, in that case, there was no existing *222 arrangement whatsoever between the related parties, much less an arrangement with a business-oriented foundation. It is therefore clearly distinguishable. Cf. Strauss v. United States, 199 F. Supp. 845 (W.D. La. 1961). Moreover, we are constrained to note that there was another transaction in that case comparable to the one involved herein and involving related parties. The Court found that the transaction had business substance and rejected respondent's contention that it should not be recognized. See 16 T.C. at p. 475. Decision will be entered for the petitioner. Footnotes
1. The return for the taxable period ended 8/31/63 was Theatre's final corporate income tax return because it was completely liquidated at the end of this period.↩
1. All references, unless otherwise specified, are to the Internal Revenue Code of 1954, as amended. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (5) Rents; * * *↩
2. We attach no significance to the $100 differential in the rent called for by the 1950 and 1963 lease agreements.↩
3. Respondent seeks to dismiss the objective of recouping the investment and losses of Theatre as a recoupment by the Goldwurms which served only their personal purposes.↩