FULL SERVICE BEVERAGE COMPANY AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Full Serv. Beverage Co. v. Commissioner
Docket Nos. 4330-92, 10526-92
United States Tax Court
T.C. Memo 1995-126; 1995 Tax Ct. Memo LEXIS 129; 69 T.C.M. (CCH) 2221; March 27, 1995, Filed *129 Decision will be entered under Rule 155. For petitioner: Claude R. Wilson, Jr. and Kemble White. For respondent: Richard D. Fultz. RUWE
RUWE
MEMORANDUM OPINION RUWE, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows: Docket No. 4330-92
Additions to Tax
TYE
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
9/30/84
$ 706,416.00
$ 35,320.80
50 percent of the
$ 176,604.00
interest due on
$ 706,416.00
9/30/85
428,929.00
21,446.45
50 percent of the
107,232.25
interest due on
$ 428,929.00
Additions to Tax
TYE
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
9/30/86
$ 250,594.00
$ 12,529.70
50 percent of the
$ 62,648.50
interest due on
$ 250,594.00
9/30/87
354,277.00
17,713.85
50 percent of the
88,569.25
interest due on
$ 354,277.00
Docket No. 10526-92
Additions to Tax
TYE
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
9/30/88
$ 11,477
$ 8,194
50 percent of the
$ 38,099
interest due on
$ 40,089
Additions to Tax
TYE
Deficiency
Sec. 6653(a)(1)
Sec. 6661
9/30/89
$ 1,352,881
$ 75,181
$ 148,701
*130 After concessions, the issues for decision are: (1) Whether purported consulting fees are deductible for the years ending September 30, 1988, and 1989; (2) whether certain payments by petitioner were distributions with respect to stock, or whether they were interest on indebtedness; and (3) whether petitioner is liable for additions to tax under section 6661 [1] for substantial understatements of income tax for the taxable years ending September 30, 1988, and 1989. Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, third supplemental stipulation of facts and attached exhibits, stipulation of agreed issues, and second stipulation of agreed issues are incorporated herein by this reference. For purposes of *131 convenience, our findings of fact will be combined with our opinion regarding each issue. Background
At the time the petitions were filed, petitioner's principal place of business was in Wichita, Kansas. Petitioner is a soft drink bottling and distribution company. Petitioner, formerly known as the 7-Up Wichita Bottling Co., was formed in 1948. From 1948 to 1990, the stock of petitioner was owned by three families -- the Fraziers, the Brownes, and the Shawvers. Petitioner bottled and distributed a variety of soft drinks, including 7-Up, Dr. Pepper, Canada Dry, RC Cola, Crush, and Hires. As of 1987, petitioner operated three bottling plants, each located in a different city in the United States: Colorado Springs, Colorado; Wichita, Kansas; and Fort Worth, Texas. In addition to the bottling plants, petitioner had several distribution centers servicing the areas surrounding the plants. Issue 1. Consulting Fees
Sometime in 1987, petitioner, through John Frazier, petitioner's chairman and chief executive officer, indicated that it was interested in purchasing the All American Bottling Co.'s (All American) Denver, Colorado, operations. The owners of All American, however, *132 would not sell the Denver operations separate from the company as a whole. Petitioner was not interested in purchasing All American as a whole; however, Stephen Browne, petitioner's vice chairman, was. At this time, Mr. Browne had interests in and was actively involved in soft drink businesses unrelated to petitioner. For the purpose of acquiring All American, Mr. Browne organized the Browne Bottling Co. and certain affiliated corporations. One affiliated corporation was the Denver Acquisition Co., which was to acquire the assets and liabilities of All American's Denver operations. The Denver Acquisition Co. was the vehicle by which petitioner ultimately purchased All American's Denver operations. Simultaneously with Mr. Browne's obtaining financing for the purchase of All American, petitioner obtained financing for its purchase of the Denver operations. [2] Pursuant to a "Purchase Agreement" dated "as of November 2, 1987", petitioner purchased Browne Bottling Co.'s series B preferred stock for $ 11.2 million. Pursuant to an "Exchange Agreement" dated "as of November 25, 1987", petitioner exchanged the series B preferred stock for all the common stock of Denver Acquisition Co. *133 As a result, and as initially intended, petitioner acquired the Denver operations previously owned and operated by All American. Mr. Browne's purchase of All American and petitioner's acquisition of All American's Denver operations were completed on or about November 4, 1987. On or about October 24, 1987, petitioner's board of directors had authorized the purchase of Browne Bottling Co.'s series B preferred stock and authorized the following transaction: a. Finder's Fee. A $ 1,000,000 finder's fee payable to Stephen B. Browne Company, which is owned and controlled by Browne, payable only upon the purchase by [petitioner] of the Browne Bottling Preferred Stock described above.
On the same day that petitioner purchased the Browne Bottling Co. preferred stock, petitioner paid the $ 1 million to Mr. Browne pursuant to the aforementioned board authorization. *134 At the time the $ 1 million was paid to Mr. Browne, he was not under any obligation to repay that amount to petitioner, and Mr. Browne did not intend to repay the $ 1 million. Sometime in December 1987, after the $ 1 million had been paid to Mr. Browne, Mr. Browne's accountant indicated to Mr. Frazier that it would be best for purposes of Mr. Browne's personal income taxes if the $ 1 million payment was characterized as a loan. Petitioner, upon the request of Mr. Browne's accountant, recharacterized the $ 1 million payment as a loan. Mr. Browne signed a promissory note made payable to petitioner in the amount of $ 1 million, plus interest. Even though the promissory note was dated November 4, 1987, it was not executed until sometime in February 1988. Because of the request of Mr. Browne's accountant that the $ 1 million payment be recharacterized as a loan, petitioner and Mr. Browne entered into a purported consulting agreement. Even though the consulting agreement provided that "This Agreement is made as of the 4th day of November, 1987," it was not actually executed until sometime in February 1988. The consulting agreement provided that Mr. Browne would "perform such executive, *135 marketing and financial services as may be requested by the chief executive officer of [petitioner] from time to time." According to this agreement, Mr. Browne's compensation for these services was to be as follows: Date
Amount
Nov. 4, 1988
$ 300,000
Nov. 4, 1989
$ 280,000
Nov. 4, 1990
$ 260,000
Nov. 4, 1991
$ 240,000
At the time the purported consulting agreement was executed, Mr. Browne was an officer of petitioner. In addition to the compensation for his services under the purported consulting agreement, during 1988 and 1989, petitioner paid Mr. Browne approximately $ 10,000 a month for his services as an officer of petitioner. On the same day Mr. Browne received payments from petitioner under the purported consulting agreement, Mr. Browne executed checks payable to petitioner for the same amount. The checks Mr. Browne executed were purportedly in satisfaction of the $ 1 million that had been recharacterized as a loan. On March 30, 1990, petitioner purchased Mr. Browne's interest in petitioner. On or about April 2, 1990, petitioner terminated the purported consulting agreement. Simultaneously with the termination of the purported consulting agreement, *136 petitioner and Mr. Browne entered into a purported noncompetition agreement. Under the purported noncompetition agreement, petitioner agreed to pay Mr. Browne $ 260,000 on November 4, 1990, and $ 240,000 on November 4, 1991, the very same amounts that remained to be paid under the purported consulting agreement. Respondent disallowed petitioner's consulting fee deductions and determined that the $ 1 million was paid to Mr. Browne as a finder's fee in conjunction with petitioner's purchase of Browne Bottling Co.'s series B stock. Respondent's determinations are presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent contends that the recharacterization of the $ 1 million payment as a loan, combined with the execution of the consulting agreement and subsequent covenant not to compete, was an attempt to obtain tax benefits that were not otherwise available. According to respondent, petitioner and Mr. Browne characterized the $ 1 million payment as a loan and concocted a check-swapping scheme so that (1) petitioner's payments to Mr. Browne under the purported consulting *137 and noncompetition agreements would have the appearance of legitimate business expenditures, and (2) Mr. Browne's payments to petitioner would appear to be in satisfaction of the purported loan. We agree. Mr. Browne signed a backdated promissory note made payable to petitioner in the amount of $ 1 million, plus interest. But, Mr. Browne admitted that he had never intended to repay the $ 1 million. In connection with the recharacterization of the $ 1 million payment as a loan, petitioner and Mr. Browne entered into a purported consulting agreement that, just like the promissory note, was backdated. Petitioner contends that the purported consulting agreement was a bona fide arrangement whereby petitioner retained Mr. Browne to represent petitioner in its dealings with Heller. In support of its contention, petitioner points out that the consulting agreement provided that it would be canceled if financing from Heller was not obtained. This provision, however, is meaningless and does not support petitioner's contention, since the financing from Heller was obtained at least as early as November 2, 1987, and the consulting agreement was not executed until sometime in February 1988. *138 [3]
Additionally, during 1988 and 1989, Mr. Browne's salary as an officer of petitioner was approximately $ 10,000 a month. Under the purported consulting agreement, Mr. Browne's fee was to be $ 300,000 and $ 280,000 for 1988 and 1989, respectively. Based on Mr. Browne's own description of his responsibilities, we find it implausible that petitioner would pay Mr. Browne more for his services with respect to the loans with Heller than for his services as an officer of petitioner. [4]
*139 Finally, petitioner's contention that the purported consulting agreement was a bona fide agreement is contradicted by the cancellation of the consulting agreement and the execution of the purported noncompetition agreement. On April 2, 1990, the purported consulting agreement was terminated, and petitioner and Mr. Browne entered into a purported noncompetition agreement. Payments under the noncompetition agreement were to be the exact amounts that remained under the consulting agreement prior to its termination. Based on the foregoing, we find that petitioner never loaned Mr. Browne $ 1 million, and we find that the consulting and noncompetition agreements were established as a means by which Mr. Browne could defer paying income tax and ostensibly pay off the purported $ 1 million loan and provide petitioner with a fabricated tax deduction. Accordingly, we sustain respondent's determination. [5]
*140 Issue 2. Preferred Stock
By order dated January 11, 1993, we granted petitioner's motions for leave to file first amended petitions. In its amended petitions, petitioner claims for the first time that payments made to Western Investment Fund (Western), nominee of the Kansas Public Employees Retirement System (KPERS), during the taxable years ending September 30, 1990, and 1991, were interest on indebtedness rather than dividends with respect to its preferred stock. Prior to filing these motions, petitioner had treated the transactions with Western as involving the issuance of preferred stock and the payment of dividends thereon. Petitioner now argues that as a result of recharacterizing the preferred stock as a loan, it is entitled to interest expense deductions for the taxable years ending September 30, 1990, and 1991, which "result in a net operating loss carryback to the deficiency year pending before the Tax Court in this action which ends on September 30, 1987 and effects [sic] the tax computation for the year ending September 30, 1988." To resolve this issue, we must decide whether petitioner's preferred stock was in substance a debt obligation. On March 30, 1990, *141 petitioner purchased the Browne family's interest in petitioner for $ 3.6 million. To finance this transaction, petitioner contacted Mr. Richard L. West of Peters, Gamm, West, and Vincent, Inc., an investment management group that managed the Western account for KPERS. In their preliminary discussions, Mr. West and petitioner discussed the possibility of Western and petitioner's entering into a subordinated debt agreement for $ 3.8 million. At the same time petitioner was structuring the purchase of the Browne family's interest, petitioner was attempting to restructure its outstanding loan obligations with Heller. Petitioner was in default on its outstanding loan obligations to Heller of approximately $ 18 million. Petitioner and Mr. West discussed with representatives of Heller the idea of a subordinated debt agreement between petitioner and Western. In these discussions, amounts of $ 5 and $ 8 million in subordinated debt were considered. Heller, however, believed that any additional debt would be financially disastrous to petitioner. Therefore, Heller declined to approve a loan from Western to petitioner. Nevertheless, Heller proposed that Western purchase preferred stock *142 from petitioner. On March 30, 1990, petitioner and Western entered into an agreement labeled "Preferred Stock and Warrant Agreement". Western paid $ 5 million to petitioner in exchange for 50,000 shares of petitioner's preferred stock, $ 100 par value. The "Preferred Stock and Warrant Agreement" provides that $ 3.6 million was to be used to purchase the Browne family's interest in petitioner and that the remaining balance was to be paid to Heller. Petitioner now contends that the $ 5 million it received from Western was a loan and not a payment for an equity investment in petitioner. Respondent contends that the $ 5 million was an equity investment in petitioner. Petitioner bears the burden of proof. Rule 142(a). Whether preferred stock is to be treated as equity or debt, and, therefore, whether payments to the holder of preferred stock constitute dividends or interest, "turns upon the consideration of all the relevant facts." [6]Crawford Drug Stores, Inc. v. United States, 220 F.2d 292, 295 (10th Cir. 1955) (citing John Kelley Co. v. Commissioner, 326 U.S. 521 (1946)); Miele v. Commissioner, 56 T.C. 556, 564 (1971), *143 affd. without published opinion 474 F.2d 1338 (3d Cir. 1973), affd. without published opinion sub nom. Spiniello v. Commissioner, 475 F.2d 1396 (3d Cir. 1973); Ragland Inv. Co. v. Commissioner, 52 T.C. 867, 875-876 (1969), affd. 435 F.2d 118 (6th Cir. 1970); Zilkha & Sons, Inc. v. Commissioner, 52 T.C. 607, 612 (1969). In John Kelley Co. v. Commissioner, supra at 530, the Supreme Court stated: There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. So-called stock certificates may be authorized by corporations which are really debts, and promises to pay may be executed which have incidents of stock. * * *
*144 Courts have outlined a variety of relevant factors for determining whether payments are interest on indebtedness or distributions with respect to stock. In analyzing these factors, we recognize that "preferred stock by its very nature evidences some of the protective features customarily associated with a debt instrument". Ragland Inv. Co. v. Commissioner, 52 T.C. at 875 (citing Commissioner v. Meridian & Thirteenth Realty Co., 132 F.2d 182, 186 (7th Cir. 1942), revg. 44 B.T.A. 865 (1941); Charles L. Huisking & Co. v. Commissioner, 4 T.C. 595, 599 (1945)). In Crawford Drug Stores, Inc. v. United States, supra at 295, the Court of Appeals for the Tenth Circuit stated that while the "name given to securities is not conclusive in respect to their nature * * * the nomenclature used by the parties is a factor not to be ignored." See also Miele v. Commissioner, supra at 564 ("The certificates were labeled, structured, and repeatedly referred to throughout as preferred stock"); Ragland Inv. Co. v. Commissioner, 52 T.C. at 876 *145 ("the parties consistently, and without exception, referred in a multiplicity of documents * * * to the certificates involved as 'preferred stock' and the payments with respect thereto as 'dividends'"); Zilkha & Sons, Inc. v. Commissioner, supra at 613 ("all treated the investment as a purchase of preferred stock. This treatment has been consistently carried through in documents relating to the purchase of the Preferred Stock, tax returns, financial statements, minutes * * *, and the amended articles of incorporation".) Similar to the cases cited above, the parties referred to the transaction herein as a purchase of preferred stock, and the payments with respect thereto as dividends. On March 28, 1990, in a letter to Mr. Jerry Anderson of Commerce Bank & Trust, the bank that managed Western's investment trust account, Mr. West stated that Western "should invest $ 5,000,000 for a purchase of redeemable preferred stock" in petitioner. On March 29, 1990, petitioner amended its articles of incorporation to include in its capital stock "50,000 shares of redeemable exchangeable preferred stock having a par value of $ 100 per share". On March 30, 1990, *146 petitioner and Western entered into an agreement labeled "Preferred Stock and Warrant Agreement". Paragraph 2.2(a) of this agreement provides that the capitalization of petitioner consisted of: (i) 600 shares of Common Stock, with $ 100.00 par value, * * * (i) [sic] 50,000 shares of Preferred Stock, $ 100.00 par value, none of which is presently issued * * * * * * and, (iii) no other shares of preferred or other Capital Stock. * * *
Paragraph 2.2(e)(2) of this agreement provides that, subject to the approval of petitioner's then senior lender, and after the repayment by petitioner of all indebtedness to Heller, Western could exchange all its outstanding preferred stock for subordinated secured debt of petitioner. [7] Thus, the agreement distinguished between common stock, preferred stock, and subordinated secured debt. The agreement also distinguished Western as an "investor" in petitioner from Western as a "potential lender" and referred to Western's payment as a "capital contribution". *147 In its "Corporate Annual Report" filed with the State of Kansas for the period ending September 28, 1991, petitioner disclosed that it had issued 50,000 shares of preferred stock for $ 5 million. In petitioner's audited financial statements for the periods ending September 30, 1990, and September 28, 1991, that were prepared by KPMG Peat Marwick, certified public accountants, the preferred stock was disclosed under the heading "Stockholders' equity" as "10% mandatory redeemable cumulative preferred stock, $ 100 par and redemption value, authorized and issued 50,000 shares". [8]
On July 10, 1990, petitioner executed check No. 803315 for $ 144,444.44 to Western. On check stub No. 803315, it was noted that the $ 144,444.44 was for "STOCKDIV". In a letter from Janice Rupert of Peters, Gamm, West, and Vincent, Inc., to Ms. Carol Cervantez of Commerce Bank & Trust, the $ 144,444.44 payment was described as a "Preferred *148 Stock Dividend". A history report of Western's trust account that was produced by Commerce Bank & Trust describes the $ 5 million payment as a purchase of 50,000 shares of petitioner's preferred stock and the receipt of the $ 144,444.44 as dividends on the preferred stock. The "Notes to Consolidated Financial Statements" prepared by KPMG Peat Marwick, provides that petitioner "declared and paid the accrued dividends on preferred stock through July 15, 1990 in the amount of $ 144,445." The $ 144,444.44 payment by petitioner to Western was treated on petitioner's Form 1120 (U.S. Corporation Income Tax Return) for the period ending September 30, 1990, as a cash distribution reducing retained earnings. Petitioner also issued Western a Form 1099-DIV reporting ordinary dividends paid of $ 144,444.44. In support of its contention that we should construe this transaction as a loan, petitioner points out that the definition section of the "Preferred Stock and Warrant Agreement" provides the following: "Loan Documents": means this Agreement, the Warrant, the Subordinated Term Note, the Security Documents and all documents to be executed at any time by Corporation in favor of [Western] *149 pursuant to this Agreement.
This is not persuasive evidence that the preferred stock was in substance debt, particularly in light of the fact that the "Preferred Stock and Warrant Agreement" also provided that, if certain future events were to occur, petitioner had the option of exchanging the preferred stock for subordinated secured debt that would be evidenced by a "Subordinated Term Note", the terms of which were also specified in the Agreement. Other terms defined in the definition section lead to the unmistakable conclusion that the preferred stock was intended to be equity and not debt. Most notable is the definition of "Capital Contribution", which is defined as "the capital contribution made by [Western] to [petitioner] to acquire Preferred Stock of [petitioner] pursuant to the Agreement." Also, "Agreement" is defined as "this Preferred Stock and Warrant Agreement"; and "Subordinated Term Note" is defined as "the promissory note of [petitioner] designated Subordinated Term Note if executed and delivered pursuant to * * * this Agreement." (Emphasis added.) In Crawford Drug Stores, Inc. v. United States, 220 F.2d at 296, the Court *150 of Appeals for the Tenth Circuit stated that where an agreement provides that the dissolution and liquidation rights of the certificate holders are subordinate to the rights of general corporate creditors, this is significant because "it is normally an attribute of a creditor relationship that in the event of dissolution or liquidation creditors share in the assets before stockholders". See also Miele v. Commissioner, 56 T.C. at 565; Ragland Inv. Co. v. Commissioner, 52 T.C. at 877; Zilkha & Sons, Inc. v. Commissioner, 52 T.C. at 615-616. As in the above cited cases, paragraph 2.2(a) of the "Preferred Stock and Warrant Agreement" provides that the preferred stock has a preference upon liquidation over all other capital stock of petitioner. Thus, in effect, the rights of the holders of the preferred stock were subordinate to the rights of petitioner's general corporate creditors. See Crawford Drug Stores, Inc. v. United States, supra at 296; Ragland Inv. Co. v. Commissioner, 52 T.C. at 877. Another factor indicative of stockholder *151 status is the "conferral of a voice in corporate management without an operative act of default with respect to the corporate instrument involved". Ragland Inv. Co. v. Commissioner, 52 T.C. at 877; see also Zilkha & Sons, Inc. v. Commissioner, supra at 616. Paragraph 3.5 of the "Preferred Stock and Warrant Agreement" provides: 3.5 Director Rights; Board Meetings and Right to Designate Board. (a) [Petitioner] agrees that its Board of Directors consist of five (5) members, one (1) of whom shall be designated by [Western]. Not less than five (5) days written notice of all meetings of the Board of Directors of [petitioner] shall be given; if such notice is not given, a quorum shall consist of not less than three (3) members of the Board of Directors, one (1) of whom must be the member designated by [Western]. * * *
Paragraph 3.5 of the agreement also provides that Western has the "right to designate one (1) additional individual to observe and participate in discussion at any meetings of the Board of Directors or executive or similar committees" of petitioner; and in the event of default and until the *152 default is cured, Western has the right to designate two individuals to replace two of the directors designated by petitioner. To minimize the above provision, petitioner argues that Western never appointed an individual to petitioner's board of directors. [9] However, paragraph 3.5(a) provides that Western "shall" designate an individual to the board, and that if proper notice is not provided, a quorum "shall" consist of not less than three directors, one of whom" must" be a member designated by Western. These provisions are mandatory, not elective. Moreover, in the event of default, Western could have designated 3 of the 5 directors. We find these provisions indicative of an interest in equity, not debt. *153 The "intent of the parties in creating the relationship with the corporation is a highly significant factor in deciding these questions." Ragland Inv. Co. v. Commissioner, 52 T.C. at 876; see also Crawford Drug Stores, Inc. v. United States, supra at 295-296; Miele v. Commissioner, supra at 565. "Lacking sorcery powers to divine the parties' subjective intent, courts must always rely on the overt manifestations thereof, i.e., the parties' acts." Ragland Inv. Co. v. Commissioner, 52 T.C. at 876. Petitioner argues that Mr. West's testimony evidences an intent to treat this transaction as a loan. Mr. West testified that his firm was authorized to place only $ 4 million of Western's funds in equity-type investments. Even though Mr. West's firm was authorized to place only $ 4 million of Western's funds in equity investments, Mr. West testified that investing $ 5 million in petitioner's preferred stock was justifiable since the preferred stock "carried the characteristics of debt, and hence, it continued to qualify under those criteria". Apparently, *154 Mr. West's firm satisfied itself that the debt characteristics included in the "Preferred Stock and Warrant Agreement" were sufficient to eliminate concerns over placing too much of Western's funds in investments containing strictly equity-type characteristics. We do not believe this evidences an intent to treat this transaction as a loan, and certainly the outcome of this issue is not dictated by the characteristics of debt that Mr. West's firm considers sufficient to satisfy its obligations to Western. We previously noted that "preferred stock by its very nature evidences some of the protective features customarily associated with a debt instrument." Ragland Inv. Co. v. Commissioner, 52 T.C. at 875 (citing Commissioner v. Meridian & Thirteenth Realty Co., 132 F.2d 182, 186 (7th Cir. 1942), revg. 44 B.T.A. 865 (1941); Charles L. Huisking & Co. v. Commissioner, 4 T.C. 595, 599 (1945)). We can only surmise that the reason petitioner and Western settled on an investment in preferred stock was because it was mutually acceptable to Heller, Western, and petitioner. *155 Moreover, Mr. West's testimony and the few fleeting references to the transaction as a loan are overborne by: (1) Petitioner's amending its articles of incorporation to include the preferred stock; (2) petitioner's filing with the State of Kansas its "Corporate Annual Report" in which it was disclosed that it had issued 50,000 shares of preferred stock for $ 5 million; (3) petitioner's denominating the agreement of the parties as a "Preferred Stock and Warrant Agreement"; (4) petitioner's noting on the stub of the check making the purported interest payment that it was for "STOCKDIV"; (5) petitioner's issuing Form 1099-DIV reporting ordinary dividends paid of $ 144,444.44; (6) petitioner's treatment of the $ 144,444.44 payment on its corporate income tax return for the period ending September 30, 1990, as a cash distribution reducing retained earnings; (7) the references throughout the "Preferred Stock and Warrant Agreement" to the transaction as a purchase of preferred stock; (8) the clear distinctions in the agreement between equity and debt; (9) the provision in the agreement that causes the preferred stockholders' liquidation rights to be subordinate to the rights of general corporate *156 creditors; (10) Mr. West's letter to Mr. Anderson of Commerce Bank & Trust stating that Western "should invest $ 5,000,000 for a purchase of redeemable preferred stock" in petitioner, and the letter from Ms. Rupert of Peters, Gamm, West, and Vincent, Inc., to Ms. Cervantez of Commerce Bank & Trust, describing the $ 144,444.44 payment as a "Preferred Stock Dividend"; (11) the history report of Western's trust account describing the $ 5 million payment as a purchase of 50,000 shares of petitioner's preferred stock and the receipt of the $ 144,444.44 as dividends on the preferred stock; and (12) the disclosures on petitioner's audited financial statements treating the transaction as a purchase of preferred stock and stating that petitioner declared and paid dividends on the preferred stock. In light of the evidence, we are not persuaded that petitioner and Western intended to treat this transaction as a loan. Petitioner points out that the preferred stock was to be redeemed on a fixed date, there were early redemption provisions, dividends were not dependent on earnings, and past due dividend payments bore interest at 10 percent per annum and were payable upon redemption of the stock. *157 While these are all factors, they are not conclusive. [10] Whether the purchase of petitioner's preferred stock was an equity investment or an interest in debt is to be determined from all the facts and circumstances. Thus, notwithstanding the existence of some debt-like characteristics of the preferred stock, we find, based on all the facts and circumstances, that Western's purchase of petitioner's preferred stock was an equity investment. The transaction herein was consistently referred to as preferred stock and the payments with respect thereto as dividends; the dissolution and liquidation rights of Western were subordinate to the rights of general corporate creditors; Western had the right to participate in corporate management; and petitioner and Western intentionally structured this transaction as preferred stock. Based on the above factors and in light of the above cited cases, we hold that petitioner has not shown by a preponderance of the evidence that the preferred stock should be treated as debt for tax purposes. *158 Even though we have held that petitioner has not shown by a preponderance of the evidence that the preferred stock instrument was debt, we have observed that the preferred stock had some debt-like characteristics and recognize that it is impossible to determine with mathematical precision whether an instrument is equity or debt. This Court has required that taxpayers provide "strong proof" when contending that the parties' chosen form does not reflect the substance of the transaction. Estate of Durkin v. Commissioner, 99 T.C. 561, 574 (1992). [11] In particular, we have applied the strong proof doctrine when determining whether the substance of the transaction was debt or equity. See Litchfield v. Commissioner, T.C. Memo. 1994-585; Miller v. Commissioner, T.C. Memo. 1989-153, affd. without published opinion 900 F.2d 260 (6th Cir. 1990). Taxpayers who have structured a transaction as either preferred stock or debt, but then take the position that the substance of the transaction is different from the course chosen, must provide strong proof that the chosen form *159 does not reflect its substance. Petitioner has clearly not met this burden. *160 Issue 3. Section 6661 Addition to Tax
Respondent determined that there was a substantial understatement of tax attributable to petitioner's purported consulting fee payments for the taxable years ending September, 30, 1988, and 1989. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 10,000 (in the case of a corporation). Sec. 6661(b)(1)(A) and (B). An understatement may be reduced, however, if the taxpayer shows that there was substantial authority for such treatment of the item, or that the relevant facts affecting the tax treatment of the item are adequately disclosed on the return. Sec. 6661(b)(2)(B). Moreover, section 6661(c) provides that the Secretary may waive all or any part of the addition to tax on a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Petitioner contends that it is not subject *161 to the additions to tax pursuant to section 6661 because there was substantial authority for deducting the consulting fee payments. Section 1.6661-3(a)(2), Income Tax Regs., provides that the substantial authority standard is less stringent than a "more likely than not" standard, but stricter than a reasonable basis standard. In evaluating whether a taxpayer's treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6661-3(b), Income Tax Regs.
For authority supporting petitioner's position, petitioner simply directs us to "See the preceding argument on the consulting issue". On the issue of whether petitioner's consulting fees were deductible, we found that petitioner never loaned Mr. Browne $ 1 million and that the consulting and noncompetition agreements were fabricated. We are aware of no authority that supports such deductions. Accordingly, we find that *162 there was no substantial authority for the deduction of petitioner's consulting fee payments. Petitioner next contends that it is not subject to the additions to tax pursuant to section 6661 because respondent abused her discretion in failing to waive the additions to tax. Congress made respondent's waiver a discretionary act, and we give due deference to respondent's discretion. Petitioner has not shown that there was reasonable cause for the understatement and that it acted in good faith. [12]
Because of the multiple concessions by the parties, it is unclear whether the disallowance of the consulting fee deductions results in a substantial understatement of tax. *163 [13] Therefore, if the Rule 155 computation reveals that petitioner's understatement of income tax liability with respect to the consulting fee deductions is "substantial" as defined in section 6661(b), the addition to tax under section 6661(a) will be sustained. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years inissue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In connection with the purchase of the Denver operations, petitioner obtained three loans from Heller Financial, Inc. (Heller), totaling $ 35 million.↩
3. Petitioner points out that even though the purported consulting agreement was not executed until sometime in early 1988, its terms had been orally established about the same time the $ 1 million payment was recharacterized as a loan. Even assuming there was an oral understanding of the terms of the consulting agreement at this time, this understanding was still after Nov. 2, 1987, the date the financing from Heller had been obtained. The $ 1 million payment was not recharacterized as a loan until sometime in December 1987.↩
4. Mr. Browne testified that he had no similar consulting fee arrangement with All American. Mr. Browne also represented All American in its dealings with Heller. The loans All American had outstanding with Heller were approximately $ 60 million, whereas petitioner's were approximately $ 30 million.↩
5. Petitioner contends that the $ 1 million payment to Mr. Browne was originally for Mr. Browne's services in acquiring loans from Heller, but that for Federal income tax purposes, the $ 1 million payment should be treated as a loan because the transaction was recharacterized as a loan within the same taxable year as the original transaction, thereby rescinding the original transaction and canceling its tax effect. Petitioner argues, alternatively, that if we find that respondent properly disallowed the deductions for consulting fees, then the $ 1 million should nevertheless be characterized as payment for Mr. Browne's services in acquiring the Heller loans, and, therefore, be amortizable over the life of such loans. Petitioner, however, made only a few conclusory comments on this point and, therefore, did not fully develop this argument on brief. In any event, the testimony of Mr. Frazier and Mr. Browne regarding the original purpose of the $ 1 million payment is ambiguous and insufficient to overcome their contemporaneous written description of this payment as a finder's fee. Therefore, we reject petitioner's alternative argument.↩
6. The Tax Reform Act of 1969, Pub. L. 91-172, sec. 415(a), 83 Stat. 487, 613, added sec. 385, which authorizes the Secretary of the Treasury "to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness (or as in part stock and in part indebtedness)." Final regulations were issued in December 1980, but with delayed effective date that was extended several times. T.D. 7747, 1981-1 C.B. 141; T.D. 7774, 1981-1 C.B. 168; T.D. 7822, 1982-2 C.B. 84. The regulations were ultimately withdrawn effective Aug. 5, 1983. T.D. 7920, 1983-2 C.B. 69↩.
7. There is no evidence that the option under the agreement to exchange the preferred stock for subordinated secured debt was ever exercised. The parties stipulated that Western "still holds such preferred stock of Petitioner."↩
8. "Notes-payable and long-term debt" was also a heading on petitioner's consolidated balance sheet.↩
9. In support of its contention that Western did not appoint a member to petitioner's board, petitioner only points to the following testimony by Mr. Frazier on cross examination: Q Under the terms of this agreement, Mr. Frazier, was it your understanding that the [KPERS] had the right to participate on the Board of Directors? A I think they do. It has never been activated.↩
10. See Crawford Drug Stores, Inc. v. United States, 220 F.2d 292, 295-296 (10th Cir. 1955) (fixed maturity date is not conclusive); Miele v. Commissioner, 56 T.C. 556, 566 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973) ("we do not consider this as conclusive of the character of the certificates, * * * as it is not unusual for preferred stock to have a maturity date"); Ragland Inv. Co. v. Commissioner, 52 T.C. 867, 878 (1969), affd. 435 F.2d 118 (6th Cir. 1970) ("assuming arguendo the existence of a fixed maturity date, that factor alone, while relevant, is not conclusive"); Zilkha & Sons, Inc. v. Commissioner, 52 T.C. 607↩ (1969) (instrument was characterized as preferred stock even though dividends were payable from funds other than earnings).
11. In Hamlin's Trust v. Commissioner, 209 F.2d 761, 764-765 (10th Cir. 1954), affg. 19 T.C. 718 (1953), the Court of Appeals for the Tenth Circuit stated: It is well settled that the incidence of taxation depends upon the substance of a transaction; that tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title; and that the Government may look at the realities of a transaction and determine its tax consequences despite the form or fiction with which it was clothed. * * * * * * where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. * * * Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction. [Citations omitted.]
The principle announced in Hamlin's Trust has been equated with the strong proof doctrine. See Ullman v. Commissioner, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957) ("we agree with the Tenth Circuit in their decision in Hamlin's Trust v. Commissioner, that when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration" (emphasis added; fn. ref. omitted)); Atchison T. & S.F. RR. Co. v. United States, 443 F.2d 147, 152↩ (10th Cir. 1971) (recognizing that at times "the taxpayer might well have a significantly heavier burden to demonstrate its view of the substance of the transaction") (fn. ref omitted).
12. Petitioner first raised the issue of whether respondent abused her discretion in its petitions. Petitioner has not formally requested that respondent waive the additions to tax. Therefore, Fisher v. Commissioner, 45 F.3d 396 (10th Cir. 1995), revg. T.C. Memo. 1992-740↩, is distinguishable.
13. Petitioner argues that it is not subject to the additions to tax pursuant to sec. 6661 since, after concessions, disallowance of the consulting fee deductions does not result in a substantial understatement of tax. The parties submitted a "Stipulation of Agreed Issues" and a "Second Stipulation of Agreed Issues" containing 101 agreed issues. Petitioner has not demonstrated how these 101 agreed issues impact the sec. 6661 substantial understatement computation. Accordingly, whether disallowance of the consulting fee deductions results in a substantial understatement of tax must await the Rule 155 computation.↩